UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 08-20198-CIV-ALTONAGA/Simonton

**WORLD HOLDINGS, LLC**,

      Plaintiff,

vs.

**FEDERAL REPUBLIC
OF GERMANY**,

      Defendant.

_____/

## ORDER

**THIS CAUSE** came before the Court for a hearing on February 15, 2011 [ECF Nos. 195,

196] on Defendant, the Federal Republic of Germany's ("Germany['s]") Motion for Partial Summary

Judgment [ECF No. 176], filed on January 14, 2011.  The Court has carefully considered the parties'

written submissions, arguments, and the applicable law.

## I.  BACKGROUND

### A. Historical Background

Following World War I, there began a period of "vast credit extension to Germany."

Message from President to Senate, Hearings before the Committee on Foreign Relations, 83rd

Congress, 1st Session, 6 (Apr. 10, 1953) (hereinafter "President's Message") [ECF No. 189-2].  The

lion's share of this credit originated in the United States from banks, from commercial and industrial

enterprises, and from German dollar bonds.  *See id.* at 6.  One loan extended to Germany was the

Dawes loan of 1924.  *See id.*  This loan was issued with the cooperation of eight countries, including

the United States.  *See id.*  Upon receiving this loan, Germany offered for subscription in the United

Case No. 08-20198-CIV-ALTONAGA/Simonton

States $110 million worth of bearer bonds[1] known as Dawes Bonds, which were listed on the New York Stock Exchange and negotiated and sold through a placement agent in New York City.  (*See* Amended Verified Complaint ("Am. Compl.") ¶¶ 16–17 [ECF No. 12]).  Principal and interest on the Dawes Bonds were payable in U.S. gold dollars in New York City at the offering fiscal agent in the United States.  (*See id.* ¶ 19).  Issuance of the Dawes loan followed a period of great inflation that caused the "mark" to cease existing as Germany's currency.  *See* President's Message 6.  In 1924, backed by the gold proceeds of the Dawes loan, Germany issued its new currency — the reichsmark. *See id.*  Germany's economy then took off.  *See id.*

Six years later, the Young loan of 1930 was issued.  *See id.*  This was an "attempt to reverse the deteriorating financial position of Germany."  *Id.*  "Tranches[2] of this loan" were issued in nine countries.  *Id.*  Upon receiving this loan, Germany offered for subscription in the United States $98.25 million of a second bearer bond, the Young Bonds (*see* Am. Compl. ¶¶ 23–24), which were also listed on the New York Stock Exchange and negotiated, sold, and payable in New York City. (*See id.* ¶ 26).  The Dawes and Young Bonds were backed by the full faith and credit of Germany and required Germany to maintain sinking funds[3] paid by various revenue sources.  (*See id.* ¶¶ 20, 26).

Between the time the Dawes and Young loans were issued, Germany also entered into several other loans and received substantial short-term credit.  *See* President's Message 6.  This amounted

---

[1]  "A bond payable to the person holding it."  Black's Law Dictionary (9th ed. 2009).

[2]  "1. A bond issue derived from a pooling of similar debt obligations. . . .  2. A block of bonds designated for sale in a foreign country."  Black's Law Dictionary (9th ed. 2009).

[3]  "A fund consisting of regular deposits that are accumulated with interest to pay off a long-term corporate or public debt."  Black's Law Dictionary (9th ed. 2009) .

Case No. 08-20198-CIV-ALTONAGA/Simonton

to $6 billion in external obligations for Germany by the end of 1930. *See id.* The United States and U.S. investors extended a "substantial part of this credit." *Id.* U.S. investors floated 55 percent of the long-term loans, totaling more than $2.1 billion. *See id.* Of that amount, $350 million were from the Dawes and Young loans. *See id.*

Eventually credit stopped flowing to Germany. In the early 1930s, "there was a complete cessation of further foreign credit to Germany." *Id.* at 7. A banking moratorium was declared in Germany in 1931. *See id.* Then an agreement was reached — the standstill agreement — "whereby the banks of nine countries agreed not to reduce their credits to German banks and industry except pari passu[4] and in a gradual, orderly manner." *Id.* The standstill agreement continued until the hostilities that would escalate into World War II ("WWII") began. *See id.*

On July 1, 1933, Germany "established a transfer moratorium restricting foreign exchange transfers for non-Reich debt service and required the debtors to deposit reichsmarks for full debt service in a Conversion Office for Foreign Debts (known as the Konversionskasse)." *Id.* "This arrangement inaugurated a period of currency manipulation by the Nazi regime." *Id.*

In 1934, following the rise of the Nazi regime, Germany defaulted on many of its external loans, and payments in foreign currencies ceased in part on Dawes and Young loans. *See id.*; Message from President to Senate, Enclosure 7(d) annexed to Hearings before the Committee on Foreign Relations, 83rd Congress, 1st Session, 230 (Apr. 10, 1953) (hereinafter "Enclosure 7(d)") [ECF No. 190-1]. Payment was subject to "arrangements negotiated country by country." President's Message 7. American bondholders held a weak negotiating position and were offered

---

4 "[Latin 'by equal step'] Proportionally; at an equal pace; without preference <creditors of a bankrupt estate will receive distributions *pari passu*>." Black's Law Dictionary (9th ed. 2009).

3

Case No. 08-20198-CIV-ALTONAGA/Simonton

unfavorable payment terms.  *See id.*

After defaulting on the loans and driving the bonds' prices down, the Germans repurchased many bonds "on a large scale at default prices" and reduced the volume of outstanding German bonds.  *Id.*; *see also* Enclosure 7(d), 230.  These bonds were "physically returned to Germany without being presented for cancellation and were to a large extent held by German Government banks in Berlin."  Enclosure 7(d), 230.

Following the outbreak of WWII, the U.S. Securities and Exchange Commission ("SEC") requested "brokers and dealers to refrain from effecting transactions" in German securities.  Trading in West German Bonds, 18 Fed. Reg. 7570 (proposed Nov. 30, 1953) (codified at 17 C.F.R. pt. 240.15c2–3).  Following the cessation of hostilities, trading was restored on the other Axis countries' securities before German securities; trading in Italian securities resumed in 1947, and trading in Japanese securities resumed in November 1950.  Trading in German Securities, 19 Fed. Reg. 313 (Jan. 19, 1954) (codified at 17 C.F.R. pt. 240.15c2–3).  The SEC, however, maintained its request for brokers and dealers to refrain from trading in German securities.  *See id.*  In 1951,  September 1952, and April 1953, the SEC continued its request that trading be stayed.  *See id.*  Before trading resumed, the SEC sought "full assurances" for investors "through validation proceedings, that only securities which constitute 'good delivery' would be afforded a market in the United States."  *Id.*

Following the end of WWII, "the German economy was in a state of ruin and stagnation," and the economies of the formerly German-occupied countries were "ravaged" and "enfeebled." President's Message 7.  Once freed from German occupation, these countries began to make enormous demands on Germany for reparations and compensation.  *See id.* at 7–8.  An agreement was then reached between the United States, the United Kingdom, and the Soviet Union that

4

Case No. 08-20198-CIV-ALTONAGA/Simonton

reparation payments should be curtailed to leave enough resources to allow the German people to "subsist without external assistance." *Id.* (quoting House Foreign Affairs Committee print, 83d Cong., 1st sess., Potsdam agreement, pt. III, sec. 19, p. 70).

As Europe continued its recovery from the War, so too did Germany. *See id.* To help establish "normal commercial relationships between the Federal Republic [of Germany] and the rest of the free world," German debt settlements were negotiated. *Id.* at 8–9. After WWII, Germany committed to paying its prewar liabilities in order to restore confidence in its economy and normalize economic and financial relations with other countries. (*See* Am. Compl. ¶¶ 46–48). To that end, Germany, the United States, and fifteen other countries signed the Agreement on German External Debts ("London Debt Agreement" or "LDA") in 1953,[5] which resulted in a proposed settlement of most of Germany's prewar debts, including the bonds.[6] (*See* Am. Compl. ¶¶ 51–52).

In 1953, a series of other measures were also enacted.[7] One of those measures was the Agreement Between the United States of America and the Federal Republic of Germany Regarding Certain Matters Arising from the Validation of German Dollar Bonds, U.S.–F.R.G., 4 U.S.T. 885, Apr. 1, 1953 (hereinafter "1953 Treaty"). Thereunder, the United States and Germany "agreed that it is in their common interest to provide for the determination of the validity of German dollar bonds

---

[5] Agreement on German External Debts, Feb. 27, 1953, 4 U.S.T. 443, T.I.A.S. No. 2792, 1953 WL 44333 (1953) (hereinafter "London Debt Agreement" or "LDA").

[6] Bondholders could decline to accept the offer of settlement under the London Debt Agreement. *Cf.* London Debt Agreement, 4 U.S.T. 443, at Art. 15.

[7] The undersigned has taken judicial notice of four of the related measures (*see* [ECF No. 79]): (1) the Validation Law of August 25, 1952 ("Validation Law"); (2) the Agreement on Validation Procedures of February 27, 1953 ("Validation Treaty"); (3) the Second Implementing Ordinance of March 13, 1953; and (4) the Treaty of April 1, 1953 ("1953 Treaty").

Case No. 08-20198-CIV-ALTONAGA/Simonton

in view of the possibility that a large number of such bonds may have been unlawfully acquired during hostilities in Germany or soon thereafter." *Id.* pmbl.  The 1953 Treaty incorporated by reference Germany's Validation Law. *See Abrey v. Reusch*, 153 F. Supp. 337, 339 (S.D.N.Y. 1957). Germany's Validation Law was enacted on August 25, 1952 by West Germany — Bundesgesetzblatt 1952 (BGBl.II) ("Validation Law"). *See* Validation Law, BGBl.II, at 305 [ECF No. 46-1].  This law required the validation of all foreign currency bonds and other securities. *See* Trading in German Securities, 19 Fed. Reg. 313.

Validation was required because purportedly a "large volume of German foreign currency bonds, purchased for redemption by the Germans and held in negotiable form in Berlin, . . . found their way into unauthorized hands after the occupation of Berlin in 1945." Trading in West German Bonds, 18 Fed. Reg. 7570.  In March 1951, after West Germany announced it would recognize prewar external debts, the SEC consulted with the U.S. Department of State and announced it "did not intend to withdraw its request that brokers and dealers refrain from effecting transactions in German securities until full assurances could be given to investors, through validation proceedings, that only securities which constitute 'good delivery' would be afforded a market in the United States."  Trading in German Securities, 19 Fed. Reg. 313.  The SEC said validation was "necessary" because of the large numbers of German securities that had been lost, looted, or stolen by Soviet armed forces after they occupied Berlin. *Id.*  At the time, it was "known that a large number [of bonds had fallen] into the hands of the Soviet forces." Enclosure 7(d), 230.  While the procedures for validation were being negotiated, the SEC maintained its request for dealers to refrain from trading in these securities. *See* Trading in German Securities, 19 Fed. Reg. 313.  Estimates were that the principal amount stolen by the Soviets was from $250 to $350 million. *See* Enclosure 7(d), 230.

Case No. 08-20198-CIV-ALTONAGA/Simonton

If the Soviets introduced the "unlawfully held bonds into [the U.S.] security markets," it would "create serious problems for the Germans, and it would benefit no one except the Soviet Government . . . ." *Id.* This introduction of unlawfully held bonds "would [then] materially reduce the amount which American holders of legitimate bonds could expect to recover on such bonds." *Id.*

After the LDA, Validation Law, Validation Treaty, and the 1953 Treaty were enacted, the SEC lifted its moratorium request and trading on these bonds resumed.

**B. World Holdings's Bonds**

In this action, Plaintiff, World Holdings, LLC ("World Holdings"), is seeking to collect on certain Dawes and Young Bonds (the "Bonds") that Germany sold between 1924–1930. (*See* Def.'s Statement of Undisputed Material Facts ("SMF") ¶ 1 [ECF No. 176-1])).  World Holdings claims it owns or controls 1,305 Young Bonds and 853 Dawes Bonds.  (*See id.* ¶ 2).

World Holdings agrees with Germany that the 1953 Treaty requires certain bonds be validated before Germany will pay them. (*See id.* ¶ 3).  The parties disagree, however, as to whether the 1953 Treaty applies to World Holdings's Bonds.  (*Compare* SMF ¶ 6 *with* Pl.'s Statement of Material Facts in Opposition ("SMFO") ¶ 6 [ECF No. 179]).  Germany asserts the 1953 Treaty applies to World Holdings's Bonds, while World Holdings maintains the Treaty does not.  (*See* SMF ¶ 6; SMFO ¶ 6).  World Holdings contends the 1953 Treaty only applies to bondholders who accepted the settlement offer provided in the earlier LDA, and World Holdings never accepted the LDA settlement offer.  (*See* SMFO ¶ 6).

World Holdings's Bonds have not been registered for validation, nor has World Holdings

7

Case No. 08-20198-CIV-ALTONAGA/Simonton

attempted to have them validated. (*See* SMF ¶ 9).[8]  It is possible to have the Bonds validated given that Germany has "maintained an Examining Authority for the validation of the Bonds continuously and without interruption from 1953 up to and including the present." (*Id.* ¶ 10).  Although the period for timely registration and validation was from 1953 through 1958, the Validation Law allows for late validation. (*See id.* ¶¶ 12–13).  Post-1958, the Examining Authority provides its non-binding opinion to the German court, which now decides whether or not to validate bonds. (*See id.* ¶¶ 14–15).

## II.  LEGAL STANDARD

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

## III.  ANALYSIS

World Holdings asserts that neither it nor its predecessors in interest accepted the LDA for the Bonds at issue. (*See* SMFO ¶ 6).  Asserting that the validation requirement applies only to the

---

[8] World Holdings has submitted 137 of its bonds for validation; these are not the subject of the present Motion. (*See* SMF ¶ 16; SMFO ¶ 16).

Case No. 08-20198-CIV-ALTONAGA/Simonton

bonds of bondholders who have accepted the LDA, World Holdings and its predecessors in interest never validated the Bonds. (*See* SMF ¶¶ 8–9; SMFO ¶¶ 8–9). For its part, Germany insists the validation requirement applies to all bonds. (*See* Mot. 5–6). The question presented by the Motion is strictly a legal one, namely, whether the validation requirement applies to World Holdings's Bonds. If World Holdings is required to validate its Bonds, then Germany is entitled to the partial summary judgment it seeks.

## A. Applicable Agreements and Laws

### 1. *The 1953 Treaty and the earlier German Validation Law*

On July 13, 1953, the United States Senate advised ratification of the 1953 Treaty. *See* 1953 Treaty, 4. U.S.T. 885, at pmbl. The President ratified the Treaty on August 4, 1953, the Treaty entered into force on September 16, 1953, and the President proclaimed the Treaty on October 19, 1953.[9] *See id.*

"The 1953 Treaty and Validation Law were part of the overall process of quelling uncertainty about, and facilitating the 'orderly settlement of,' debts owed by territory that became West Germany after World War II." *Mortimer Off Shore Servs., Ltd. v. Fed. Rep. of Ger.*, 615 F.3d 97, 102 (2d Cir. 2010) (quoting 1953 Treaty, 4. U.S.T. 885, at pmbl.). "In order to make validation effective and to bar the assertion of claims by holders of bonds looted by the Russians, this agreement [the 1953 Treaty] ha[d] the purpose of preventing the holders of non-validated bonds from enforcing these bonds in judicial or other proceedings in the United States." Enclosure 7(d), 233. This process was

---

[9] A treaty does not become "the law of the land" with respect to individual rights until the President proclaims it. *Haver v. Yaker*, 76 U.S. (9 Wall.) 32, 35 (1869).

Case No. 08-20198-CIV-ALTONAGA/Simonton

set up in order to separate legitimate bonds from bonds that were looted, seized, and circulated by the Soviets. *See Abrey*, 153 F. Supp. at 339.

Pursuant to the 1953 Treaty, "No bond . . . shall be enforceable unless and until it shall be validated either by the Board for the Validation of German Bonds in the United States established by the Agreement on Validation Procedures, or by the authorities competent for that purpose in the Federal Republic [of Germany]." 1953 Treaty, 4. U.S.T. 885, at Art. II.[10]  For validation, the 1953 Treaty "incorporated by reference" West Germany's 1952 Validation Law — Bundesgesetzblatt 1952 ("BGBl.II").[11] *Abrey*, 153 F. Supp. at 339; 1953 Treaty, 4. U.S.T. 885, at Art. I.  Further, the 1953 Treaty acknowledged that the United States and Germany had already agreed on procedures to "accomplish" their joint "purpose" of determining the validity of German dollar bonds under the Validation Law in light of the "possibility" that many bonds may have been unlawfully acquired during WWII or soon thereafter.  1953 Treaty, 4. U.S.T. 885, at pmbl. (acknowledging the Agreement Regarding the Validation of Dollar Bonds of German Issue, U.S.–F.R.G., Feb. 27, 1953, 4 U.S.T. 797 ("Validation Treaty")).

Pursuant to the Validation Law, West Germany "assumed liability for certain specified foreign currency bonds issued before the end of World War II." *Mortimer Off Shore Servs.*, 615 F.3d at 102.  The Validation Law requires that "bonds held on January 1, 1945, outside West German borders as they existed in 1937, be registered, submitted along with relevant evidence, and validated

---

[10]  According to the SEC, under the 1953 Treaty, "no German Dollar bonds subject to the validation laws of the Federal Republic of Germany are enforceable against the issuer unless they have been validated." Sec. & Exch. Comm'n Release Notice, Release No. 34-26180 (Oct. 20, 1988).

[11]  A copy of the Validation Law can be found at ECF No. 46-1.

10

Case No. 08-20198-CIV-ALTONAGA/Simonton

after an administrative hearing by a Board for the Validation of German Bonds in the United States ('Validation Board') in Germany or the country of offering." *Id.* (citing Validation Law, BGBl.II, Art. 3 at 306; Art. 8 at 307; Art. 23 at 310–11).

For validation, the Validation Law requires that the bond be: (1) registered for examination; and (2) be: (a) a "bond held abroad," defined as "a bond located on January 1, 1945, outside of the borders of Germany . . ."; or (b) a bond having a registrant who was the "lawful acquirer of the bond," that is, one who acquired ownership on or before January 1, 1945 as a result of a transaction occurring at a stock exchange; or through a bank from January 1, 1945 to May 8, 1945 as a result of "legally effective action" taken after January 1, 1945 by authorized governmental authorities; or "by virtue of an uninterrupted chain of private law acquisitions of title going back to a person who was the owner or co-owner" on January 1, 1945; or that (c) "the bond has been restituted to the registrant, for reason of a confiscation." Validation Law, BGBl.II, Art. 3 at 306; Art. 38 at 314.

In order to register the bonds so they can be validated, the holder must submit them to the Examining Agency and include the information required by Article 39. *See id.*, Art. 39 at 314; Art. 40 at 314–15. Following registration, the registrant bears the burden of proving the validation requirements have been met. *See id.*, Art. 41 at 315. Failing to register the bonds before the registration periods ended would result in the bonds' invalidation. *See id.*, Art. 50 at 317; Art. 21 at 310; Art. 37 at 314. The registration periods ended in 1958. (*See* SMF ¶ 12). Where a person fails to register and have his or her bonds validated in accordance with the Validation Law, the bonds may not be enforced. *See Mortimer Off Shore Servs.*, 615 F.3d at 115–17.

11

Case No. 08-20198-CIV-ALTONAGA/Simonton

Where a bond is invalidated, the Validation Law allows for "subsequent" registration and validation. Validation Law, BGBl.II, Art. 51 at 317. When a bond is not timely registered and the failure is not the fault of the person "entitled to register," subsequent registration and validation may occur. *Id.* This may be done in one of two ways. First, under Article 51, bonds may be registered with the Examining Agency and submitted to the Chamber for Settlements. *See id.*, Art. 51(2) at 317. Under this method, bonds will only be validated "if the denial of validation would effect extraordinary hardship upon the bond holder . . . ." *Id.* Second, under Article 52, the bondholder may "claim compensation from the issuer and any third party liable directly as a debtor for the bonded obligation . . . ." *Id.*, Art. 52 at 317. This method requires that: (1) the bond would have been validated if timely registered, and (2) the failure to register was not due to the person's own "gross negligence." *Id.* A holder may only proceed under Article 52 after "it has been finally adjudicated that the conditions on which [the right to compensation] depends exist." *Id.* Further, the "procedural provision of Articles 37 to 48 shall apply *mutatis mutandis.*"[12] *Id.* "Exclusive jurisdiction to make such adjudication shall rest with the Chamber for the Settlement of Securities of the district in which the issuer has its seat." *Id.*

Following the Chamber's decision (whether timely registered or not), an appeal may be taken. *See id.*, Art. 31(6) at 312. The appeal must be taken within three months of the Chamber's decision, and no further appeals are allowed. *See id.*, Art. 31 at 312. Final decisions are binding "on any court or administrative agency . . . ." Validation Law, BGBl.II, Art. 66 at 321.

---

[12] "This Latin phrase simply means that the necessary changes in details, such as names and places, will be made but everything else will remain the same." *In re McMahon*, 235 B.R. 527, 536 n.7 (S.D.N.Y. 1998).

Case No. 08-20198-CIV-ALTONAGA/Simonton

The Validation Law remains in effect today and is still listed in Germany's statutory code. *See Mortimer Off Shore Servs.*, 615 F.3d at 102. Likewise, even after the unification of Germany, the 1953 Treaty remains in force. *See id.* at 115; *see also* United States Department of State, *Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2010*, at 102 (2010), *available at* www.state.gov/documents/organization /123747.pdf (last visited May 6, 2011). There has been no agreement between the United States and Germany to "nullify" the Validation Law. *Mortimer Off Shore Servs.*, 615 F.3d at 115.

## 2. *The London Debt Agreement*

On February 27, 1953, a little over one month before the United States and Germany signed the 1953 Treaty in Bonn, Germany, the United States entered into a multilateral treaty, the London Debt Agreement. *See* London Debt Agreement, 4 U.S.T. 443. The London Debt Agreement "resulted in a proposed settlement of most of Germany's pre-World War II debts, including the [Dawes and Young] Bonds." *World Holdings, LLC v. Fed. Rep. of Ger.*, 613 F.3d 1310, 1312 (11th Cir. 2010) (footnote call number omitted). Following the LDA, "a series of measures were enacted relating to" it, one of which was the 1953 Treaty. *Id.*

The LDA provided settlement and expedited-payment options for owners of Young and Dawes Bonds. *See* London Debt Agreement, Annex I, 522–23. In addition, the LDA gave "legal effect in Germany to the settlement terms and procedures," defined "the debts covered by the Agreement and provid[ed] for the deferral of reparation and analogous claims arising out of World Wars I and II," and prohibited "discrimination in the settlement of debts and supplement[ed] the settlement procedures contained in the Annexes . . . ." Message from President to Senate, Enclosure

13

Case No. 08-20198-CIV-ALTONAGA/Simonton

7(a) annexed to Hearings before the Committee on Foreign Relations, 83rd Congress, 1st Session, 203 (Apr. 10, 1953) (hereinafter "Enclosure 7(a)") [ECF No. 190-1]. Any "benefits" of the LDA were limited to those who accepted its offer. *See* London Debt Agreement, Art. 15, at 453. But even after accepting, under the LDA Germany would not pay on any bonds that required validation unless and until they were validated; validation was a prerequisite to the LDA. *See id.*, Annex I(C), at 527; Trading in German Securitites, 19 Fed. Reg. 313. The LDA's offer remained open for "at least five years." London Debt Agreement, Annex I(C)(8)(b), at 527.

The LDA did not "nullify" non-assenting creditors' legal rights. Enclosure 7(a), 204. Those who did not assent to the LDA could still "apply to German courts for declaratory judgments in order to keep their rights alive . . . ." *Id.* Furthermore, the LDA did not impair bondholders' rights to sue in non-German courts. *See id.*

The LDA's preamble described the purposes and objectives of the LDA as an "overall" settlement of German prewar external debts. London Debt Agreement, pmbl. at 446–47. Article 4 defined those prewar debts covered by the LDA. *See id.*, Art. 4, 448–49. To be a covered debt, it must have originated and been due before May 8, 1945. *See id.* at , Art. 4, at 448. The LDA thus only applied to prewar debts, with postwar debts excluded from the scope of the Agreement. *See* Enclosure 7(a), 204. In addition, the debt had to be either covered by Annex I (as the Bonds here are), or meet certain other requirements. *See* London Debt Agreement, Art. 4, at 448. Where the debts met those requirements, they were paid in "the currency in which they [were] payable under the terms of the obligation." *Id.*, Art. 11, 451.

Article 12 of the LDA limited bonds' gold clauses. *See id.*, Art. 12, 452. As a result, the

14

Case No. 08-20198-CIV-ALTONAGA/Simonton

"Young bonds would be adjusted on the basis of the dollar rather than on the basis of gold." Enclosure 7(a), 207.  To compensate for the "loss in relative position," additional interest was to be paid in "[o]ne-half per cent higher interest on the dollar tranches of the Dawes and Young Loans and one per cent higher amortization rate on the dollar tranches of the Dawes Loan . . . ."  *Id.*

Annex I is the LDA annex relevant to the Dawes and Young Bonds.  Enclosure 7(a), in discussing Annex I, estimated the amount of covered public debt to be in the range of $800 million. *See id.* at 211.  This amount constituted "approximately 50 percent of the total outstanding prewar external debts dealt with under the settlement plan."  *Id.*  Under the LDA, the Dawes Bonds' maturity date was extended to 1969.  *See id.*  With the Dawes loan, there was no reduction in principal, but arrears of interest were "recalculated to 5 percent and new 20-year bonds bearing 3 percent interest would be reissued."  *Id.*  New bonds for the "balance of the interest arrears" would not be issued until Germany was reunified.  *Id.*  Interest that "commenc[ed]" on January 1, 1953 was to be paid at "5½ percent on the dollar tranche and 5 percent on all other tranches."  *Id.*  Finally, with respect to the Dawes loan, a "cumulative sinking fund of 3 percent per annum on the dollar tranche and 2 percent per annum on all other tranches" became effective in 1958.  *Id.*

Regarding the Young loan, Annex I extended the Young Bonds' maturity date to 1980.  *See id.*  "Arrears of interest from default to December 31, 1944 [were] recalculated at 4½ percent of the adjusted principal and new 20-year bonds bearing 3 percent interest [were] issued . . . ."  *Id.*  New bonds for the remaining interest-arrears balance would not be issued until Germany reunified.  *See id.*  Interest that "commenc[ed]" on January 1, 1953 was to be paid at "5 percent on the dollar tranche and 4½ percent on all other tranches."  *Id.*  Then, commencing in 1958, "a cumulative sinking fund

15

Case No. 08-20198-CIV-ALTONAGA/Simonton

of 1 percent per annum" became effective. *Id.* "Provision" was made "for payment only in the currency of the country in which the issue was made." *Id.* "[I]n the event of the depreciation of any currencies of issue by 5 percent or more, the amount payable in any such currency w[ould] be calculated in relation to the least depreciated currency of issue." *Id.*

Finally, in order to take advantage of the LDA, under Annex I the bonds must have first been validated under Germany's Validation Law. *See* London Debt Agreement, Annex I, 527; Trading in German Securities, 18 Fed. Reg. 313. In LDA Annex I, Germany stated its intention to establish a procedure to validate foreign bonds:

> The Federal Government[13] undertakes to do all in its power in order to establish, on the basis of the German Validation Law passed by its Parliament and about to be enacted, an appropriate procedure for the validation of German foreign currency bonds, which procedure shall be effective in the several creditor countries as soon as possible but not later than on 1st February, 1953.
>
> Payment on bonds or coupons which require validation under the German validation procedure shall not be made until such bonds or coupons shall have been validated pursuant thereto.

London Debt Agreement, Annex I, at 527.

**3. *The Validation Treaty***

On the same day as the delegates signed the LDA (over one month prior to the signing of the 1953 Treaty), a bilateral treaty was also signed between Germany and the United States — the Validation Treaty. This treaty, signed at Bonn, Germany on February 27, 1953, "set in operation in the United States procedures for the validation of dollar bonds held outside Germany on January 1,

---

[13] The "Federal Government" refers to the "Government of the Federal Republic of Germany (hereafter referred to as the Federal Government) . . . ." London Debt Agreement, Annex I(A), at 522.

16

Case No. 08-20198-CIV-ALTONAGA/Simonton

1945" — bonds that required validation under the German Validation Law.  Enclosure 7(d), 233.

The Validation Treaty's preamble begins with a brief history of the German dollar bonds.

*See* Validation Treaty, 4 U.S.T. 797, at pmbl.  It states:

> [A]ny payment on bonds which are illegally held and which no longer
> represent valid obligations of the issuers, not only would be
> inequitable to the German debtors, but would necessarily reduce the
> amount of foreign exchange or other funds available to make
> payments to their legitimate creditors, a large number of whom are
> nationals of the United States.

*Id.*  As a result of the "uncertainties" arising from the possibility of illegal and invalid bonds

infiltrating the market, "the free and open trading in the United States of all German dollar bonds

[was] impeded . . . ."  *Id.*  It was determined that illegally held bonds "should be declared invalid."

*Id.*  Because the German bonds were "bearer instruments," the United States and Germany felt the

"most practical method" of invalidating illegal bonds was "a procedure which [would] require that

*all* German foreign currency bonds, including dollar bonds, be submitted for a determination of their

validity.  *Id.* (emphasis added).  To that end, Germany enacted the Validation Law, which Germany

"desired" would be implemented in the United States, amongst other countries.  *Id.*  The United

States had similar ideas and "wished" to implement the Validation Law within its territorial

jurisdiction.  *Id.*

In the Validation Treaty, the United States "consented" to an attached "Ordinance" issued

by Germany under the Validation Law.[14]  *Id.* § 4.  The Validation Treaty established a Validation

Board in the United States in New York City.  *See id.* § 2.  Decisions of the Validation Board would

---

[14]  The Ordinance set forth specific procedural requirements based on, and citing to, the Validation
Law.

be binding on all "concerned" persons.  *Id.* § 7.

In order to "ensure that holders in the United States of German foreign currency bonds [were] given adequate and timely notice of such action as [wa]s necessary under the Validation Law to secure validation of their bonds," the German Government agreed it would

> cause notice of such required action to be published three times in at least one newspaper of general circulation in each Federal Reserve District, territory and possession of the United States, in at least three periodicals of general circulation throughout the United States, and in at least six financial journals in the United States, and cause appropriate announcements to be sent to such other institutions and individuals as may be designated by the United States Government.

*Id.* § 5.  The time and manner of the announcements would be designated by the United States after consulting with the German Government.  *See id.*

Germany also agreed to eliminate "undue hardships" on Americans and to "make the validation procedure practicable and workable."  *Id.* § 8.  The Validation Board was to "utilize such services of any persons or public or private agencies within the United States as they may deem necessary for the purpose of carrying out the validation process expeditiously and effectively . . . ."  *Id.* § 11.  To that end, the Validation Board and Foreign Representative could "enter into contracts with such persons or agencies with respect to such services and the compensation to be paid therefor."  *Id.*  Germany agreed to pay the entire cost of the validation procedure.  *See id.* § 13.

## B. Interpretation of and Interplay Between the Treaties

### 1. *World Holdings's Position*

World Holdings contends that despite the 1953 Treaty's validation requirement, the Treaty neither applies to it nor to its Bonds.  According to World Holdings, the 1953 Treaty was one of the

Case No. 08-20198-CIV-ALTONAGA/Simonton

many bilateral treaties that worked only within the framework set out by the earlier, multilateral LDA. (*See* Mot. Opp'n 4 [ECF No. 178]). As such, the 1953 Treaty and the validation requirements do not apply to World Holdings's Bonds because it, and its predecessors in interest, never accepted the LDA's open offer of settlement. (*See id.* at 5). It describes the LDA as calling for "a single overall plan" to settle Germany's external debts. (*Id.* at 5 (quoting LDA, 4 U.S.T. 443, 447)). World Holdings contends the 1953 Treaty "must be construed" within that single overall plan; the 1953 Treaty "was not meant to have an independent status . . . ." (*Id.* at 7).

According to World Holdings, the LDA offers two options: (1) accept the LDA and receive less value on the bonds in exchange for "expedited" and guaranteed payment; or (2) reject the LDA, retain all rights (while Germany maintains all defenses), and wait for full but uncertain payment. (*Id.* at 6). Thus, World Holdings asserts not all holders of Dawes or Young Bonds are required to accept the LDA's open settlement offer "and comply with its implementing validation procedure." (*Id.* at 7).

As evidence that the Treaty was only meant to "implement" the LDA, World Holdings cites to the Preamble of the 1953 Treaty:

> WHEREAS the United States and the Federal Republic agree that further measures are required to permit debtors and creditors to proceed to the orderly settlement of the obligations arising from German dollar bonds with confidence in the stability of the procedures regarding validation and with assurance that claims prejudicial to such settlement will not be asserted on the basis of bonds which were unlawfully acquired . . . .

1953 Treaty, 4. U.S.T. 885, at Art. 2. World Holdings further maintains that the 1953 Treaty "entered into force upon the 'entry into force of the [LDA].'" (Mot Opp'n 7 (quoting 1953 Treaty,

19

Case No. 08-20198-CIV-ALTONAGA/Simonton

4. U.S.T. 885, at Art. 5)).  Specifically, the 1953 Treaty reads:

> This Agreement shall be ratified by the United States and the Federal
> Republic in accordance with their respective constitutional
> procedures.  The Agreement shall enter into force upon (a) the
> exchange of instruments of ratification at Washington, and (b) the
> entry into force of the Agreement on German External Debts between
> the Federal Republic on the one hand, and France, the United
> Kingdom of Great Britain and Northern Ireland, the United States and
> other countries on the other hand [the LDA].

1953 Treaty, 4. U.S.T. 885, at Art. 5.

World Holdings argues that its position — that the 1953 Treaty only applies to LDA assenters
— "results in a compatible interpretation of both Treaties, one that is also consistent with the plain
text of the treaties and the contemporaneous understanding of the parties who negotiated them."
(Mot. Opp'n 9).  According to World Holdings, Germany's interpretation requiring all bondholders
to validate conflicts with:

> (1) the plain text of LDA Article 15 [which] provides that holders of
> Dawes and Young bonds had the right to accept or reject the LDA's
> offer and implementing conditions; (2) the contemporaneous
> understanding of the German and U.S. negotiators of the LDA; and
> (3) the view of the United States Government that the validation
> condition does not apply to bondholders who did not accept the
> LDA's offer.

(*Id.* at 9).

World Holdings also maintains that the LDA "most forcefully advances the collective
purpose of resolving Germany's pre-WWII external debt," and if the LDA and the 1953 Treaty are
found to be in conflict, the LDA must control.  (*Id.* at 10 (citing *Fotochrome, Inc. v. Copal Co. Ltd.*,
517 F.2d 512, 518 n.4 (2d Cir. 1975))).  It further asserts that to the extent the treaties have two
interpretations, World Holdings's more liberal construction granting greater rights should control.

20

Case No. 08-20198-CIV-ALTONAGA/Simonton

(*Id.* (citing *In re Comm'r's Subpoenas*, 325 F.3d 1287, 1294 (11th Cir. 2003), *abrogated in part on other grounds*, *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 253 (2004))).

According to World Holdings, Germany's "argument" implies a conflict between Article 15 of the LDA and Article II of the 1953 Treaty. (*Id.*). If this conflict indeed exists, and if the LDA and the 1953 Treaty are "incompatible," then, World Holdings maintains, "the treaty entered last in time — the LDA — controls." (*Id.*; *see also id.* at 11 (quoting Restatement (Third) of Foreign Relations, Section 323(2))). World Holdings states it was the intent of the LDA drafters that the "multilateral LDA" would "control any implementing bilateral agreements," because the LDA parties "were well aware of the presumption that the last-treaty-in-time controls . . . ."[15] (*Id.* at 11).

In sum, then, World Holdings maintains the LDA and the 1953 Treaty conflict, are ambiguous, and must be interpreted by the Court with the aid of extraneous sources. (*See* Mot. Opp'n 10).

## 2. *Treaty Interpretation*

A treaty must be read and interpreted "in context" and "in light of the treaty's object and purpose." *World Holdings*, 613 F.3d at 1316 n.10 (citing *In re Comm'r's Subpoenas*, 325 F.3d at 1294). "The goal of treaty interpretation is to determine the actual intention of the parties 'because

---

[15] While the LDA does mention bilateral agreements, it discusses bilateral agreements signed the same day as the LDA. *See* London Debt Agreement, pmbl., at 447 ("[T]he United States of America, having found that these recommendations provide a satisfactory and equitable plan for the settlement of German external debts, have this day signed with the Government of the Federal Republic of Germany bilateral agreements for the settlement of debts arising from the post-war economic assistance furnished by [this] Government[] which set forth [the] modified rights and priorities . . . ."). The bilateral Validation Treaty was signed between the United States and Germany the same day the LDA was executed. The 1953 Treaty was not signed for over a month after the LDA and would therefore not be one of the bilateral treaties referenced in the LDA.

21

it is [the court's] responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties.'" *In re Comm'r's Subpoenas*, 325 F.3d at 1294 (quoting *Air Fr. v. Saks*, 470 U.S. 392, 399 (1985)).  The court must begin with the treaties' text and "[t]he clear import of treaty language controls unless application of the words of the treaty according to their obvious 'meaning effects a result inconsistent with the intent or expectations of its signatories.'" *Id.* (quoting *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180 (1982)).  "'If the language of the treaty is clear and unambiguous, as with any exercise in statutory construction, [the] analysis ends there and [courts] apply the words of the treaty as written.'" *Id.* (quoting *United States v. Duarte-Acero*, 208 F.3d 1282, 1285 (11th Cir. 2000)).

If the text of the treaty is not clear, however, and there is ambiguity "when read in context in light of its object and purpose, then extraneous sources may be consulted to elucidate the parties' intent from the ambiguous text." *Id.* (citing *Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134 (1989)).  This context includes a treaty's preamble.  *See Gandara v. Bennett*, 528 F.3d 823, 827 (11th Cir. 2008) (en banc).  Moreover, "'[w]here the text — read in the context of its structure and purpose — is ambiguous, [the court] may resort to extraneous tools of interpretation.'" *In re Comm'r's Subpoenas*, 325 F.3d at 1297 (quoting *Croll v. Croll*, 229 F.3d 133, 136 (2d Cir. 2000)); *see also Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700 (1988).

"'Treaties are construed more liberally than private agreements, and to ascertain their meaning [the court] may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.'" *In re Comm'r's Subpoenas*, 325 F.3d at 1297 (quoting *Volkswagenwerk Aktiengesellschaft*, 486 U.S. at 700).  Courts have admonished, however,

that "'to alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on [the court's] part an usurpation of power, and not an exercise of judicial functions.  It would be to make, and not to construe a treaty.'" *Id.* at 1294 (quoting *The Amiable Isabella*, 19 U.S. (6 Wheat.) 1, 71 (1821)).

Finally, it is important to note that although treaties are liberally construed,

> [t]his does not mean . . . that treaty provisions are construed broadly.
> Rather, this "liberal" approach to treaty interpretation merely reflects
> . . . the willingness of courts, when interpreting difficult or ambiguous
> treaty provisions, to "look beyond the written words to the history of
> the treaty, the negotiations, and the practical construction adopted by
> the parties."

*Duarte-Acero*, 208 F.3d at 1285 (alterations in original) (quoting *Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634, 638–39 (5th Cir. 1994)).

### 3.  *Extraneous Sources*

In support of its interpretation of the LDA and 1953 Treaty, under which validation procedures apply only to those accepting the LDA's settlement offer, World Holdings submits various historical documents and interpretations of the LDA.  Germany has also submitted historical documents to persuade the Court to accept its contrary view of these treaties.  These submissions are addressed below.

To be clear, after carefully reading the treaties the Court has determined they are clear and unambiguous.  The Court's analysis may thus stop.  *See In re Comm'r's Subpoenas*, 325 F.3d at 1294 (quoting *Duarte-Acero*, 208 F.3d at 1285).  Nevertheless, even if the treaties' language is ambiguous, after analyzing and consulting the extraneous sources, the Court's conclusion that the

Case No. 08-20198-CIV-ALTONAGA/Simonton

1953 Treaty and the validation requirement apply to all bonds does not change.  The Court remains

persuaded that validation is required of all bonds.

        a.  *Hermann J. Abs Statement*

World Holdings presents a public statement by Hermann J. Abs (*see* Mot. Opp'n Ex. 9 [ECF

No. 185]), a German signatory of the LDA.  According to Plaintiff, Mr. Abs stated that those who

did not accept the LDA retained all contractual rights, while Germany retained all contract defenses.

(*See* Mot. Opp'n 8).  Mr. Abs stated:

> The [LDA] was a framework agreement, and the individual
> settlements did not become valid until the offer by the debtor and
> acceptance by the creditor.  Now it was possible that a debtor would
> not make an offer, but was then forced to give one by the creditor, for
> example, by a court ruling.  Conversely, it was possible that an offer
> by a debtor would not be accepted by the creditor.  He could not be
> forced to accept it.  However, the Agreement stipulated that the claim
> by a creditor who did not do so, would not be satisfied until all other
> settled debts had been paid.  In the case of bonds, the settlement offer
> was deemed to have been accepted when the old adjusted debentures
> and interest coupons were submitted to the issuer, in order either to
> be exchanged for new units or to be correspondingly labeled by an
> imprint.

Hermann J. Abs, *Entscheidungen: 1949–1953; Die Entstehung des Londoner Schuldenabkommens*,

(v. Hase & Koehler 1991) (footnote call number omitted).  Relying in part on these remarks,  World

Holdings states both Germany and bondholders would retain all contractual rights as non-assenting

bondholders.  (*See* Mot. Opp'n 8).

        b.  *Congressional Hearings*

World Holdings also presents portions of Congressional hearings that took place before the

Committee on Foreign Relations in the U.S. Senate.  *See Hearings on the Agreements with the*

24

Case No. 08-20198-CIV-ALTONAGA/Simonton

*Federal Republic of Germany Before the Committee on Foreign Relations* (hereinafter "*Senate Hearing*"), 83rd Cong. (1953), Mot. Opp'n Ex. 8 [ECF Nos. 183–84].   James Grafton Rogers, Chairman of the Foreign Bondholders Protective Council, addressed the LDA before the Senate Committee on Foreign Relations as follows:

> Senator Green.  In other words, this is the first time that the Congress has been asked to ratify an agreement whereby some American bondholder will be deprived of his rights.
>
> Mr. Rogers.   Well, technically they are not deprived under this agreement.  It provides that the bondholder shall have the same rights he had before, if he did not accept.  But for all practical purposes it is true that a settlement negotiated with the formality that this has been, and which is embodied in approval in a treaty very greatly limits the capacity of the bondholder to do anything else than accept.

*Id.* at 110–11.  Plaintiff interprets Mr. Rogers's testimony — that no rights are lost by not agreeing to the settlement — as confirming Mr. Abs's statement that non-assenters retained all contractual rights.  (*See* Mot. Opp'n 8.)

c. *Russell L. Munk Letter*

Plaintiff submits correspondence from Russell L. Munk, Assistant General Counsel for International Affairs for the U.S. Treasury Department.  *See* Letter from Russell L. Munk, Assistant Gen. Counsel (International Affairs), U.S. Dep't of the Treasury, to Jeffery A. Westin, President, Integrated Equities, Inc. (Sept. 22, 1993) (hereinafter "Munk Letter"), Mot. Opp'n Ex. 10 [ECF No.185-1].[16]  Responding to an inquiry about the rights of bondholders, Mr. Munk wrote:

---

[16]   At the hearing held on February 15, 2011, Plaintiff's counsel described this 1993 letter as a "contemporaneous understanding."  (Summ. J. Hr'g 30:16, Feb. 15, 2011 [ECF No. 196]).

> My understanding of the rights of bondholders who did not assent to the terms of the London Debt Agreement is the same as yours, *i.e.*, the Agreement did not abrogate or limit the financial claims of non-assenting bondholders, and the bond validation process does not apply to them.

*Id.*

### d.  *Ingrid Jaeger — Rule 30(b)(6) Deponent*

World Holdings also points to testimony from Germany's Rule 30(b)(6) witness, Ingrid Jaeger, as evidence that validation only applies to LDA assenters.  It asserts Ms. Jaeger "confirmed in her deposition that all bondholders whose bonds are validated are paid under the LDA's settlement terms." (Mot. Opp'n 10 (citing Jaeger Dep. 45:23–46:2, 93:17–95:3, 113:4–115:24, Dec. 16, 2010, Mot. Opp'n Exs. 3, 12 [ECF Nos. 179–3, 185–3])).  The cited passages read:

> Q. And the court agreed with your decision [to validate]?
>
> A. Yes.
>
> Q. And these bondholders were then paid the $2,500 for the Dawes bonds and the $3,500 for the Young bonds?
>
> A. Yes.

(Jaeger Dep. 45:23–46:2).

> Q. And if the bond is subsequently validated, then the person submitting the bond then is paid; correct?
>
> A. Yes, then payment is made.
>
> Q. Okay. And do you know what the amount of the payment is on the subsequent validation for a Dawes bond?
>
> A. For a $1000 bond you get approximately $2,500 paid out.
>
> Q. And do you know what the amount is for a $500 Dawes bond?

26

Case No. 08-20198-CIV-ALTONAGA/Simonton

A. I don't know, but you could make the math because the interest is then paid for the period from '53 to '69. And I think these were 5.5 percent, and then you get the sum.

Q. Okay. So the way that the Dawes $1,000 denominated bond would be paid is the face value of the bond, which is $1,000 U.S., plus the interest from 1953 to 1969; correct?

A. Yes, but in addition there is another thing if a bond is subsequently validated. But in addition, then, a person turning in such a bond would — is also entitled to interest for the period of '34 to '38, and then up to '45, the end of World War II, and then in the end you have the funding bond of 1953. And then for the two missing years, '45 to '43, he would get the — no, '45 to '53, he would get the funding of 1990.

Q. Because of the reunification of Germany?

A. Yes, well, this bonds [sic] fell due, but since the 3rd of October it would actually also be paid in cash.

Q. The 3rd of October 2010?

A. Yes.

Q. Why is that?

A. Because the maturity was 20 years.

Q. The maturity on the funding bond?

A. Yes. They were just the same set up as the funding bonds of '53.

Q. From the London Debt Agreement?

A. The bonds of 1990 are also based on the London Debt Agreement.

(*Id.* at 93:17–95:3).

Q. Okay. Just very briefly, I'll mark this as Exhibit 8.

\*      \*      \*

27

Case No. 08-20198-CIV-ALTONAGA/Simonton

Q. Mrs. Jaeger, do you — is that your signature on the very last page
of —

A. Yes.

Q. — Exhibit 8?  Okay.

And did you write these — is that your handwriting?  Did you
write the answers to these questions next to that?

A. Yes, I did.

Q. And are the answers correct in your mind?

A. I checked my files before I wrote this letter and it is right I think.

Q. Okay.  And if I could turn your attention to the second page of the
letter dated March 18th, 2004, the first is this "yours sincerely, PP."
Do you know who that is?

A. That is just a translation, courtesy translation.

Q. A courtesy translation. Okay.  It's a courtesy translation of the
German letter that precedes it?

A. It is a translation of the German letter but the valid text would be
the German one.

Q. I understand.  Did you write the German letter?

A. Yes.

Q. And on the second page of the German letter, it refers  specifically
to the values of [sic] the court subsequently validates a Dawes bond
or a Young bond; is that right?

A. The note you mean?

Q. It would be the second full paragraph on the second page that
begins "in case — " because — I don't know, because it's in German.

A. Yeah.

28

Case No. 08-20198-CIV-ALTONAGA/Simonton

Q. You wrote that, and that is accurate?

A. Yes.

Q. Okay. And it states that: "If the court subsequently validates a thousand dollar Dawes loan then the value would be $2,500 U.S. dollars, and a validated $1,000 bond of the Young loan has a value of about roughly $3,500 U.S."; is that right?

A. Yes.

Q. And it says: "All claims out of these bonds, inclusive interest, are finally settled with that"; is that correct?

A. Yes.

Q. Is that accurate?

A. Yes.

Q. I thought you testified earlier today that interest would also be paid in different periods of time in addition to these values; is that true?

A. No, the par value is $1,000 for the Young bond and on top of that you have approximately $2,500 in interest, and therefore $3,500 for a Young bond.

Q. Okay.  So for — just to make [sure] I understand your testimony from earlier, for a Young bond, the payment of the face value of the bond plus the various interests that you — that the LDA calculates to be accrued, puts that value roughly at $3,500; correct?

A. Yes, exactly.

Q. And for a Dawes bond it is a $1,000 face value plus the various interest as laid out in the London Debt Agreement, leads to the conclusion that value then for a Dawes bond is $2,500 each; correct?

A. Yes.  For the Dawes bond you have a par value of $1,000 plus $1,500 interest, so you will have $2,500 because the majority was shorter and there was no currency security clause for the Dawes bond,

29

and therefore the value is lower.

(*Id.* at 113:4–115:24).

e. *Meeting Minutes of the Agreement on German Foreign Debts, February 27, 1953*

As supplemental authority, World Holdings submits Meeting Minutes of the Agreement on German Foreign Debts dated February 27, 1953.[17]  Informelle Besprechungen zum Abkommen über deutsche Auslandsschulden vom 27. Februar 1953) (hereinafter "Meeting Minutes"), Notice of Supp. Auth. Ex. B [ECF No. 190-2].  The Minutes reflect that the delegates repeatedly discussed what effect, if any, the LDA would have on bondholders who did not agree to the settlement. "The Belgian and the other Delegations . . . did not wish to impose the [LDA] on creditors, with no alternative course open to such creditors who might choose to remain outside the Agreement."  *Id.* at 17.

Mr. Abs acknowledged it was "always understood" that a "non-assenting creditor" to the LDA "should reserve all his rights."  *Id.* at 18, 19 ("[I]t was abundantly clear that non-assenting creditors would not be hampered in the execution of their rights by the fact that their Government had become a Party to the Agreement.").  The delegates acknowledged that although non-assenters reserved their rights, the non-assenters took a risk that they might receive "less favorable terms" than what those who accepted the LDA's settlement offer could receive. *Id.* at 18.  The LDA was crafted to ensure "no creditor would benefit unduly by remaining outside the Agreement." *Id.* at 19.  The LDA delegates were careful to ensure "no government had the right to diminish the rights of the creditors, and . . . no Delegation had done so." *Id.* at 20.  While a non-assenter could choose to not

---

[17]  When negotiating the LDA, it was understood that the Meeting Minutes "would constitute an official document" to interpret the Treaty.  Meeting Minutes 20.  The delegates understood the "well recognized rule of international law that, in any disputes regarding the interpretation of an agreement, the Minutes of meetings . . . were always admissible in order to establish the intention . . . ." *Id.* at 21.

Case No. 08-20198-CIV-ALTONAGA/Simonton

exercise rights under the LDA, the non-assenter would not have rights taken away under the Agreement. *See id.*

f. *President's Message Regarding Agreements with Germany*

Both World Holdings and Germany submitted portions of the President's Message[18] to the Senate Committee on Foreign Relations regarding various German treaties.[19] Germany submitted the President's Message and a portion of the enclosures — Enclosure 7(d) — discussing the Validation Treaty and 1953 Treaty. (*See* Reply Ex. 2 [ECF No. 189-2]). World Holdings submitted other portions of the enclosures, including Enclosures 7(a) and 7(d), referring to the Validation

---

[18] Following the President's portion of the Message was a letter from Secretary of State John Foster Dulles to President Eisenhower. *See* President's Message 3–16. The Enclosures were appended to Secretary Dulles's letter. *See id.* at 17.

[19] The President's Message, Secretary Dulles's letter, and the Enclosures are important pieces in the overall validation puzzle. The President's Message was addressed in an earlier Motion to Dismiss [ECF No. 101]. *See World Holdings*, 613 F.3d at 1314, 1317 n.11. On appeal following a denial of the Motion to Dismiss, the Eleventh Circuit acknowledged that "'[w]hile courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight,'" *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 355 (2006) (quoting *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961)), and that the Supreme Court has "never instructed that a court give 'great weight' to the State Department's or Executive's interpretation when the court's singular task is to determine whether a treaty expressly conflicts with the FSIA [Foreign Sovereign Immunities Act]." *World Holdings*, 613 F.3d at 1317 n.11 (the extended quote from *Sanchez-Llamas* is not included in the *World Holdings* opinion). The present Motion does not concern itself with the FSIA.

Moreover, because the Eleventh Circuit was considering the question whether the 1953 Treaty made Germany immune from suit in the federal courts pursuant to the FSIA, it was concerned with whether the 1953 Treaty conflicted with the FSIA. *See World Holdings*, 613 F.3d at 1314–15. In considering that question, the Eleventh Circuit found the President's Message and Enclosures "inconclusive as to the view of the State Department on the rights of bondholders who did not accept the LDA's offer of settlement to resort to United States courts." *Id.* at 1317 n.11. The Eleventh Circuit clarified that its decision was "*not* a decision as to whether World Holdings' bonds are, in fact, enforceable. We hold merely that the district court has the authority to decide that issue. The court may yet determine that World Holdings' failure to comply with the validation requirement of Article II renders its bonds unenforceable." *Id.* at 1317 (emphasis in original).

Case No. 08-20198-CIV-ALTONAGA/Simonton

Treaty, the 1953 Treaty, and the LDA.  (*See* Notice of Supp. Auth. Ex. A [ECF No. 190-1]).[20]

In his message to the Senate, President Eisenhower sought the advice and consent of the Senate to ratify four agreements with Germany, including the LDA, Validation Treaty, and 1953 Treaty.  *See* President's Message 1–2.  Secretary of State Dulles referred to the various agreements as a "comprehensive settlement of Germany's prewar and postwar debts . . . to bring about a termination of the state of default on the prewar debts which has lasted for about 20 years."  *Id.* at 4.  He noted that creditors, while feeling entitled to "full settlement of contractual obligations due them, recognized that the Federal Republic was not in a position to make full settlement."[21]  *Id.*

---

[20]  For clarity, citations to the "President's Message" will refer to Germany's submission  [ECF No. 189-2].  Citations to either "Enclosure" will refer to World Holdings's submission [ECF No. 190-1] because it contains all of the Enclosure text cited by both parties.

[21]  President Eisenhower and Secretary Dulles repeatedly used the word "settlement."  This word appears in the 1953 Treaty and World Holdings ascribes to it a certain meaning — that the word "settlement" only refers to the LDA.  It is apparent from the Executive Branch's pronouncements, however, that the word did not refer exclusively to a legal agreement between the parties to accept less in exchange for immediate payment, i.e., the LDA.

Indeed, even the LDA provided that the word "settled" or "settlement" meant more than simply accepting the LDA's terms.  *See* London Debt Agreement, Art. 3(k)–(l), at 448.  Under the LDA "settled" and "settlement" were defined as follows:

> (k) "settled," in relation to a debt, means that terms of payment and other conditions have been established for such debt in accordance with the provisions of the present Agreement and the Annexes thereto, by agreement between the creditor and debtor, or, in proceedings between the creditor and debtor, by final judgment or order of a court or by final decision of an arbitral body;

> (l) "settlement," in relation to a debt, means the establishment of terms of payment and other conditions in accordance with paragraph (k).

*Id.*

The "settled" definition reads poorly due to ambiguous punctuation.  It could be that a debt is settled either (1) by accepting the LDA and Annexes, (2) by a separate agreement between the debtor and creditor,

Case No. 08-20198-CIV-ALTONAGA/Simonton

Secretary of State Dulles noted that many German bonds fell into Soviet hands during the final days of WWII and the postwar period. *See id.* The validation procedure was designed to "prevent the sale of, or payment on, these looted bonds." *Id.* at 5. Secretary Dulles acknowledged that if Germany paid on the looted bonds, it would reduce the funds Germany would have left to pay on "legitimately held bonds." *Id.* at 6. A debt-settlement plan was thus determined to be necessary. *See id.* at 8–9.

To effectuate a resolution to the German debt problem, negotiations for a "debt settlement arrangement" began. *Id.* at 11. The arrangement was to be "comprehensive" and would require that the United States, France, and the United Kingdom modify and lower their claims for prewar debt, postwar debt, and postwar economic aid. *Id.* at 11–12. Germany's total debt outstripped its ability to pay. *See id.* at 13.

Once the three governments reduced their claims, the International Conference to Deal with the Prewar Debts at London on February 28, 1952, commenced. *See id.* The result was the LDA. *See id.* at 16. And while the LDA was being "prepared for signature," negotiations and drafting of bilateral agreements were ongoing, one of which was the 1953 Treaty. *Id.*

_____

or (3) through judicial proceedings by court order or arbitral body. *See id.* Art. 3(k). Or, it could be that a debt is settled either (1) by accepting the LDA and Annexes by agreement between the debtor and creditor, or (2) through judicial proceedings by court order or arbitral body. *See id.* In any event, World Holdings did not accept the LDA. What is relevant is that when the term "settled" or "settlement" is used, as in "the orderly settlement of the obligations arising from German dollar bonds," 1953 Treaty, 4 U.S.T. 797, pmbl., the word "settlement" refers to more than simply accepting the LDA. The LDA was not the only vehicle by which Germany "settled" its debts. This interpretation comports with the general definition of settlement, which is more than just the offer and acceptance of a settlement agreement. *See* Settlement, BLACK'S LAW DICTIONARY (9th ed. 2009); Settlement, MERRIAM-WEBSTER DICTIONARY, *available at* http://www.merriam-webster.com/dictionary/settlement (last visited May 6, 2011) (providing six different definitions of "settlement," including "payment or adjustment of an account").

33

Case No. 08-20198-CIV-ALTONAGA/Simonton

*Enclosure 7(a).* In Enclosure 7(a), the LDA is described as "giving legal effect in Germany to the settlement terms and procedures," is characterized as defining the covered debts, and is said to have delayed reparations and other claims arising out of both World Wars. Enclosure 7(a), 203. The LDA also prohibited "discrimination in the settlement of debts . . . ." *Id.* It was "important to note" that creditors' legal rights were not nullified. *Id.* at 204. In Germany, creditors had two options: they could (1) accept a settlement in accordance with the LDA to "ensure an orderly settlement of debts on a non-discriminatory basis;" or (2) "apply to German courts for declaratory judgments in order to keep their rights alive, if they d[id] not wish to assent to the settlement of their debts under the Agreement." *Id.* Additionally, the LDA did not impair the right to sue in non-German courts. *See id.*

*Enclosure 7(d).* Enclosure 7(d) discusses the German Validation Law and "Implementing Agreements." Enclosure 7(d), 230–34. The Enclosure recites the history that led to the necessity of validation requirements — the Soviets purportedly looting millions of dollars worth of bonds, and the fear that the bonds would be redeemed, thereby reducing recovery for American bondholders. *See id.* at 230. The Enclosure indicates that in response to the Soviet problem, Germany enacted the Validation Law, requiring "the submission for validation of *all* German external bonds denominated in foreign currencies. *Id.* (emphasis added). With respect to bonds held in the United States, on February 27, 1953 the United States and Germany signed a bilateral treaty concerning dollar bonds — the Validation Treaty.[22] *See id.* at 231. The Validation Treaty set up a procedure for validating

---

[22] The Bonds at issue are "dollar bonds." *See* Validation Treaty, 4 U.S.T. 797, § 1 ("(1) the term 'Dollar Bond' shall mean any bond of the types which are listed in the Schedule to the Validation Law . . . ."); *see also Abrey*, 153 F. Supp. at 339. The Dawes and Young Bonds are listed in the Schedule to the Validation Law.

Case No. 08-20198-CIV-ALTONAGA/Simonton

bonds held in the United States.  *See id.*  The purpose of validation was "to separate bonds legitimately held from those which disappeared after the occupation of Berlin."  *Id.*  It was "envisaged" that bonds would be validated "with a minimum of inconvenience to the bondholders."  *Id.*

In addition to the "procedural arrangement" in the Validation Treaty, the United States felt "a further measure was required to prevent the holders of looted bonds from using the processes of American courts to enforce payment on them."  *Id.*  "To this end, a second agreement between the Government of the United States and the Government of the Federal Republic was signed at Bonn on April 1, 1953."  *Id.*  Under the 1953 Treaty "holders of dollar bonds that have not been duly validated cannot resort to courts in the United States for the purpose of enforcing their rights . . . ."  *Id.*

The Enclosure describes the Validation Law as providing that covered bonds were "valid only if validated . . . ."  *Id.*  In this regard, the United States was confident that "all but a scattered few of the German dollar bonds held in the United States will be validated on the basis that the bond was held outside Germany on January 1, 1945."  *Id.* at 232.  Moreover, the Validation Law allowed for payment where bonds had not been validated provided the bondholder followed additional requirements and could prove "the bond would have been validated if he had made timely application."  *Id.* at 232–33.  The Validation Treaty "set in operation in the United States procedures for the validation of dollar bonds held outside Germany on January 1, 1945."  *Id.* at 233.  Both the Validation Law and Validation Treaty made it clear that the bond issuers, not holders, bore the cost of validation.  *See id.*

35

Case No. 08-20198-CIV-ALTONAGA/Simonton

Finally, the Enclosure describes the 1953 Treaty as endeavoring to "make validation effective and to bar the assertion of claims by holders of bonds looted by the Russians," and having "the purpose of preventing holders of non-validated bonds from enforcing these bonds in judicial or other proceedings in the United States." *Id.* at 234. This was to provide "assurance that claims prejudicial to the settlement [would] not be asserted on the basis of bonds unlawfully acquired." *Id.*

       g. *Notice of Registration and Validation Requirement*

World Holdings submitted examples of notices to German dollar bond holders of the LDA. (*See* Mot. Opp'n Ex. 15 [ECF No. 185-6]). The examples were advertisements placed in *The New York Times* and *The Washington Post*. (*See id.*).

       h. *Fritz Schäffer Letter*

World Holdings also submitted a letter from Fritz Schäffer, the German Minister of Finance at the time the treaties were negotiated and entered into. *See* Letter from Fritz Schäffer, Der Bundesminister der Finanzen (Oct. 2, 1953) (hereinafter "Schäffer Letter") (Mot. Opp'n Ex. 11 [ECF No. 185-2]). In his letter, Mr. Schäffer addresses the LDA and its Annexes. *See id.* at 1–6. He explains how, after making an offer of settlement, Germany would pay on "new" Young Loan Bonds, which would be issued in exchange for "old" Young Loan Bonds that had been validated. *Id.* at 2. Mr. Schäffer describes how Germany would go about paying on the bonds and the computations it would make in determining payment amounts. *Id.* at 2–3. He also discusses the role of the Bank for International Settlements. *Id.* at 2–6. World Holdings asserts Mr. Schäffer acknowledged if a debtor like Germany defaulted under the LDA, then the creditor's (bondholder's) rights would be resurrected. (Mot. Opp'n 9 (quoting Schäffer Letter)).

36

Case No. 08-20198-CIV-ALTONAGA/Simonton

i. *Christopher Kopper Expert Report*

World Holdings submitted an "expert report" from German professor Christopher Kopper. *See* Expert Report of Christopher Kopper (July 20, 2009) (hereinafter "Kopper Report") (Mot. Opp'n Ex. 14 [ECF No. 185-5]). Mr. Kopper was retained to provide testimony "regarding Germany's actions and intent concerning Germany's sovereign external debt obligations between 1924 and 1953." *Id.* at 1, 4. Specifically, he was asked to "respond" to five questions:

> [1] Did Germany intentionally default on its external debts, including specifically Dawes and Young Bonds?

> [2] Was this default part of a strategic plan to deflate the market for German external debt and enable Germany to repurchase their external debt at discounted prices?

> [3] Were German external debts seized from the Reichsbank by forces of the Soviet Union in 1945?

> [4] Were the external debts seized by forces of the Soviet Union in 1945 returned to German authorities before negotiation of the London Debt Accord and the 1953 Treaty?

> [5] Is it probable that any unregistered Dawes and Young bonds were repurchased by Germany prior to 1945?

*Id.* at 4. His opinions were, in summary, that:

> [1] Germany intentionally defaulted on its external debts, including specifically Dawes and Young Bonds, as part of a strategic plan to deflate the market for German external debts to facilitate the repurchase of such debts at discounted prices at the expense of Germany's foreign bond debtors.

> [2] In the process of executing its strategy, Germany repeatedly violated the terms and covenants of the Dawes Loan and the Young Loan.

37

[3]  Some German securities representing external debts were seized by forces of the Soviet Union at the cessation of hostilities, but those same securities were returned to the East German authorities in 1950 because of both the failure and impossibility of selling them on international bond markets or using them as hard currency.  West German authorities had knowledge of the return of these bonds from the SMA to East German authorities and knew that such bond [sic] were securely stored in East Germany.

[4]  It is very unlikely that East German government agencies ever tried to sell German foreign bonds on grey bond markets.  Since the 1960s, the East German government was anxious not to hurt their standing as a dependable credit debtor on the Western capital markets through any kind of dubious financial operation — like the sale of German foreign bonds.  The huge quantity of German pre-war bonds which was kept in the East German "*Amt fur den Rechtsschutz des Vernzogens der DDR*" until Germany's reunification in 1990 proves that the GDR never sold them off.

[5]  Available information illustrates that the Federal German government overstated the value of outstanding, unregistered bonds and that it is highly improbable that any Dawes or Young bond presented for payment was redeemed by Germany and seized by the Soviet Union.

[6]  Already before the beginning of the validation procedure, the Federal German agencies had secured or reconstructed most of the bond numbers that had been repurchased or retired before 1945.  Only a small fraction of all German foreign bonds remained unaccounted.

*Id.* at 4–5, 22.  In sum, Mr. Kopper explains that the rationale behind the validation requirements — mainly that the Soviets looted and kept millions of dollars worth of bonds — was erroneous.

j.  *Rüdiger Schultz-Söderlund Declaration*

Germany submitted a Declaration by Rüdiger Schultz-Söderlund ("Schultz-Söderlund"). (*See* Mot. Ex. 6 [ECF No. 176-6]).  Mr. Schultz-Söderlund is a "Ministrial Counsellor in the Federal Ministry of Finance of the Federal Republic of Germany."  *Id.* ¶ 1.  He opines "Dawes and Young

Case No. 08-20198-CIV-ALTONAGA/Simonton

Bonds must be validated pursuant to the 1953 Treaty . . . ." *Id.* ¶ 2.

       k. *SEC Documents*

      The documents submitted by the parties describe how the impetus for validation came, in part, from the SEC. The SEC had requested that brokers and dealers refrain from trading in German securities "until full assurances could be given to investors, through validation proceedings, that only securities which constitute 'good delivery' would be afforded a market in the United States." Trading in German Securities, 19 Fed. Reg. 313.

      Following the United States's formal entry into WWII in December 1941, the SEC requested brokers and dealers refrain from trading in German Securities. *See* Trading in West German Bonds, 18 Fed. Reg. 7570; Trading in German Securities, 19 Fed. Reg. 313; Trading in German Securities, 19 Fed. Reg. 1483 (March 8, 1954) (codified at 17 C.F.R. pt. 240.15c2–3) (hereinafter "Trading in German Securities II"). After the War ended, the SEC maintained its request that trading on these bonds not occur. *See* Trading in West German Bonds, 18 Fed. Reg. 7570; Trading in German Securities, 19 Fed. Reg. 313; Trading in German Securities II, 19 Fed. Reg. 1483.

      The SEC noted that validation was "a necessary step before a bondholder [could] participate in a settlement . . . ." Trading in German Securities, 19 Fed. Reg. 313. The Validation Treaty created procedures to allow for registration and validation of bonds. *See id.* "In addition, . . . no German dollar bond subject to the validation laws of the Federal Republic is enforceable unless and until it has been validated." *Id.* Furthermore, the SEC was "informed by representatives of the various exchanges upon which German securities ha[d] been traded that securities which ha[d] not been validated w[ould] not be considered 'good delivery' against sales made on those exchanges."

Case No. 08-20198-CIV-ALTONAGA/Simonton

*Id.* at 314.

To further enforce the validation requirement in the United States, the SEC proposed a rule

that would make it "'a fraudulent, deceptive, or manipulative act or practice,' as used in section

15(c)(2) of the [Securities Exchange Act of 1934]," to trade in any German bonds that have not been

validated. *Id.* at 313 (quoting 15 U.S.C. § 78o(c)(2)(A)). The rule, later enacted, "prohibit[ed]

brokers and dealers from trading in the over-the-counter market in German securities which are

required to be and have not been validated pursuant to the validation laws of the Federal Republic

of Germany." *Id.* The SEC adopted a final rule, Rule X-15C2-3 (17 C.F.R. § 240.15c2-3), that

stated (with 1956 Amendments[23]):

> The term "fraudulent, deceptive, or manipulative act or practice", as
> used in Section 15(c)(2) of the Act, is hereby defined to include any
> act of any broker or dealer designed to effect any transaction in, or to
> induce or attempt to induce the purchase or sale of, any security
> required to be validated under any applicable validation law of the
> Federal Republic of Germany, unless (a) such security has been duly
> validated, and (b)(1) if such security is a dollar bond, there is attached
> a document of the Validation Board for German Dollar Bonds
> certifying to the validation of such security, or (2) if such security is
> an interest coupon detached from an unvalidated dollar bond, a
> document of the Validation Board for German Dollar Bonds
> certifying to the validation of such coupon is delivered with such
> coupon.

Sec. & Exch. Comm'n Release Notice, Release No. 34-5370, 2, 1956 WL 7850 (Sept. 24, 1956).

In light of the validation requirement and because non-validated German securities would not be

considered "good delivery," the SEC deemed it "appropriate to withdraw its request that brokers and

---

[23] Earlier versions enacted and amended in 1954 were identical, but did not have subsection (b)(2);
there was only the language of (b)(1) (then only known as subsection "(b)"). *See* Trading in German
Securities, 19 Fed. Reg. 313; Trading in German Securities II, 19 Fed. Reg. 1483.

40

Case No. 08-20198-CIV-ALTONAGA/Simonton

dealers refrain from effecting transactions in West German securities to the extent that such trading is not prohibited under the provisions of its new Rule X-15C2-3."[24]  Trading in German Securities, 19 Fed. Reg. 315.

### 4. *Germany's position that the 1953 Treaty and validation requirement apply to all bonds is correct.*

Admittedly the LDA was a multinational treaty that affected only those who assented; it did not affect the rights of non-assenters such as World Holdings.  But did the bilateral 1953 Treaty's mandatory language: "No bond . . . shall be enforceable unless and until it shall be validated . . . ." 1953 Treaty, 4 U.S.T. 885, at Art. II, apply to *all* bondholders, or just LDA-assenting bondholders?

> a. *The purpose of validation contained in the 1953 Treaty is best served by requiring validation by non-assenters.*

Plaintiff seeks to convince the Court that there is ambiguity in the 1953 Treaty and LDA, thus allowing consideration of extraneous sources.  (*See* Mot. Opp'n 7–11).  The Court is not convinced that ambiguity exists.  The 1953 Treaty is clear: "*No* bond . . . shall be enforceable unless and until it shall be validated . . . ."  1953 Treaty, 4 U.S.T. 885, at Art. II (emphasis added).  Because the mandatory language is clear, the Court's analysis may end.  *See In re Comm'r's Subpoenas*, 325 F.3d at 1294.  But even though there is no ambiguity in the 1953 Treaty "when read in context in light of its object and purpose," the referenced extraneous sources further "elucidate the parties' intent" that the 1953 Treaty apply to all bondholders.

---

[24]  In 1988, the SEC rescinded Rule X-15C2-3 because  the Validation Board had ceased operating in the United States, and "most, if not all of the bonds have long since matured." Sec. & Exch. Comm'n Release Notice, Release No. 34-26180.  "Although the bonds occasionally may be traded or produced for redemption, the Commission . . . concluded that the market for these instruments has diminished substantially since the rule was adopted."  *Id*.  As a result, the SEC did not believe the rule was "necessary to guard against the sale of unvalidated German bonds by broker dealers."  *Id.*

41

Case No. 08-20198-CIV-ALTONAGA/Simonton

The parties present two alternative interpretations of the treaties' interplay: Germany insists the "no bond" language from the 1953 Treaty applies to all bondholders, whether they accepted the LDA or not; and World Holdings maintains the "no bond" language only refers to bonds owned by holders who accepted by the LDA. The most logical construction of Article II of the 1953 Treaty and its "no bond" language is the straightforward interpretation — no German dollar bond, whether subject to the LDA or not — may be enforceable "unless and until it has been validated . . . ." 1953 Treaty, 4 U.S.T. 885, at Art. II. The Treaty negotiations and ratification history, fundamental canons of treaty construction, and cases construing the treaties all strongly point to this construction.

Based upon the purposes behind mandating validation — the Soviet looting[25] and the subsequent SEC moratorium request — it would make little sense to exempt certain bonds from validation. Exempting bonds from validation would disrupt the comprehensive plan to settle Germany's debts, allowing invalid bonds to be paid and reducing the money available for other legitimate bondholders. In addition to the "procedural arrangement" in the Validation Treaty, the United States felt "a further measure was required to prevent the holders of looted bonds from using the processes of American courts to enforce payment on them." Enclosure 7(d), 231. Allowing non-assenters to use U.S. courts or trade in U.S. markets would be inconsistent with that position. It is

---

[25] Even if there was not a true threat of invalid bonds flooding the markets, this is of no moment. When the Validation Law and the various treaties were negotiated and signed, the delegates were of the view that the looted bonds posed a serious financial danger. The parties acted to ensure that no looted bond was redeemed. Although the threat of payment on these bonds may have abated, in determining the purpose behind the treaties the Court must consider the parties' knowledge at the time of negotiations and enactment. "The goal of treaty interpretation is to determine the actual intention of the parties 'because it is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties.'" *In re Comm'r's Subpoenas*, 325 F.3d at 1294 (quoting *Air Fr.*, 470 U.S. at 399). The drafters' intent can only be discerned from their statements and the known facts; the drafters did not know that the looted bonds might not pose as severe a threat to the securities markets as initially feared.

nonsensical to think the SEC would be satisfied with non-validated (and possibly looted) bonds being traded in U.S. markets so long as the trader did not accept the LDA, but not satisfied with non-validated (and possibly looted) bonds being traded in U.S. markets where those bonds were exchanged under the LDA's settlement terms. In fact, it is highly unlikely that LDA assenters would be trading their pre-1945 bonds in the market. Upon acceptance of the LDA, bondholders were trading in their old bonds for "new" bonds (or payment). The new bonds did not require validation (the old bonds were validated as a condition to receiving the new bonds). Since the new bonds did not require validation, SEC Rule X-15C2-3 did not cover them; the bonds were not "a security required to be validated under any laws of . . . Germany . . . ." Trading in German Securities II, 19 Fed Reg. 1483. And if payment was simply accepted, there would be no bond to later be traded.

> b. *The treaties are not inconsistent.*

World Holdings further asserts that the LDA and 1953 Treaty may be inconsistent. (*See* Summ. J. Hr'g 33:1). A later treaty controls over an earlier treaty if they are inconsistent; an "earlier treaty only applies to the extent its provisions are compatible with those of a later treaty." Restatement (Third) of Foreign Relations, § 323(2). Where treaties are self-executing, "if the two are inconsistent, the one last in date will control the other." *Whitney v. Robertson*, 124 U.S. 190, 194 (1888). Since the LDA was proclaimed by President Eisenhower after the 1953 Treaty, World Holdings contends the LDA controls over the 1953 Treaty to the extent the two are inconsistent. (*See* Mot. Opp'n 11; Summ. J. Hr'g 33:1–25).

This argument is unavailing. The LDA and 1953 Treaty are not inconsistent in their validation requirements. The 1953 Treaty requires that all bonds be validated before they become

Case No. 08-20198-CIV-ALTONAGA/Simonton

enforceable. *See* 1953 Treaty, 4 U.S.T. 885, at Art. II. The later-proclaimed LDA by its terms only affects assenters. (*See* Summ. J. Hr'g 22:8–25:4). Curiously, World Holdings makes much of the fact that the LDA does not affect the rights of non-assenters. (*See, e.g.*, *id.* at 22:8–25:4). By World Holdings's own argument, then, there is no conflict between the treaties because the LDA does not apply to non-assenters such as itself while the 1953 Treaty does; with regard to non-assenters only one treaty applies.

World Holdings did not accept the LDA (*see* Mot. Opp'n 4–5), and did not validate its Bonds (*see* SMF ¶¶ 8–9; SMFO ¶¶ 8–9). It is a non-assenter for which only one treaty applies, the 1953 Treaty. Since only one treaty applies to non-assenters like World Holdings, there is no conflict or inconsistency between the two treaties as applied to non-assenters.

All bondholders in the United States had to validate their bonds because the SEC had stopped all trading on the bonds. *See* Trading in German Securities, 19 Fed. Reg. 313. Once validated, a bondholder then had two options: (1) accept the LDA and less money, but be guaranteed payment; or (2) seek full payment but wait in line behind all LDA assenters with no guarantee of payment. The incentive to accept the LDA was the guarantee of prompt payment. Non-assenters risked that payment might not come for many years, if at all, and might be less than payment under the LDA's terms. The delegates negotiating the LDA acknowledged this scenario:

> M. Smeers said that his proposed wording to cover the case of a non-assenting creditor was not intended to imply that such a creditor might be able to obtain better terms by remaining outside the [LDA]; such creditors might, in fact, obtain less favorable terms than assenting creditors, but that was a risk which the Belgian Government considered such creditors should be free to incur, if they so desired.

Meeting Minutes 18 (footnote call number omitted).

44

Case No. 08-20198-CIV-ALTONAGA/Simonton

Interpreting the two statutes in this manner does not impair the "single overall plan" alluded to in the LDA.  London Debt Agreement, pmbl., at 447.  The 1953 Treaty in no way impacted anyone who accepted the LDA.  Since all assenters had to validate in order to be eligible under the LDA, *see* London Debt Agreement, Annex I, at 527, requiring *every* U.S. bondholder to validate only added an extra requirement to American non-assenters.  Since it is a bilateral agreement between the United States and Germany, the 1953 Treaty only affects non-assenting *American* bondholders.  The Treaty did not impinge on foreign non-assenters, thus satisfying foreign-delegates' concerns that the LDA not affect non-assenters' rights.  *See* Meeting Minutes 17.  In the United States, the 1953 Treaty constituted measures in addition the LDA.  *See* 1953 Treaty, 4 U.S.T. 885, at pmbl.

Finally, although the LDA states it does not affect the rights of non-assenters, this does not lead to the conclusion that no other treaty would affect the rights of non-assenters.  Just because bondholders' rights were reserved under the LDA does not mean they were reserved under all other agreements.  In the face of the SEC's actions, the United States and Germany chose to enter into the 1953 Treaty to allow German bonds to be traded again on U.S. markets.  The United States and Germany thus had strong motivation to enter into the 1953 Treaty, even though the Treaty may have limited the rights of bondholders (by adding an extra requirement before payment).

c. *World Holdings's construction renders the 1953 Treaty superfluous.*

At the hearing, World Holdings argued the LDA itself did not specifically mention validation, as the requirement is merely listed in Annex I. (*See* Summ. J. Hr'g 20:19–21:1).  Further, the Annex does not provide any validation procedures, but rather left the procedures to be explained

Case No. 08-20198-CIV-ALTONAGA/Simonton

in another treaty. (*See id.* at 51:15–52:8).[26] World Holdings contends the word "procedure" in the LDA Annex I referred to the 1953 Treaty.[27] (*Id.*). But, on the same day the LDA was signed, the United States and Germany signed the Validation Treaty, establishing the procedure for validation. *See* Enclosure 7(d), 231 ("[A] bilateral agreement between the Government of the United States and the Government of the Federal Republic [of Germany] was signed on February 27, 1953, which outlines the procedure for validation of dollar bonds held outside Germany on January 1, 1945."). The 1953 Treaty was not signed until April 1, 1953. *See generally* 1953 Treaty, 4 U.S.T. 885. Moreover, the 1953 Treaty explicitly refers to the Validation Treaty and the "procedures" outlined therein. *Id.* at pmbl, Art. II; *World Holdings*, 613 F.3d at 1313. Thus, contrary to World Holdings's position, the "procedures" called for in the LDA referred to the Validation Treaty and not the 1953 Treaty.

As discussed, the LDA called for a second treaty to enact procedures for validation so that eligibility for LDA settlement could be determined. *See* London Debt Agreement, Annex I, 527. World Holdings's theory is that it was the 1953 Treaty which created these validation procedures. (*See* Summ. J. Hr'g 51:18–52:8). But World Holdings ignores that a third treaty, the Validation Treaty, had previously set up a procedure for validating bonds, as the Validation Law required. If,

---

[26] It is apparent that World Holdings is discussing the 1953 Treaty in the cited lines when referring to the "procedure." Although World Holdings says the procedure was the "validation treaty" (Summ. J. Hr'g 51:15–52:8), World Holdings is discussing the 1953 Treaty (*see id.* 53:16–17 (calling the 1953 Treaty the "1953 Validation Treaty")). The confusion arises because there are no standard short-form names for these treaties.

[27] Annex I reads: "The Federal Government undertakes to do all in its power in order to establish, on the basis of the German Validation Law passed by its Parliament and about to be enacted, an appropriate procedure for the validation of German foreign currency . . . ." London Debt Agreement, Annex I, 527.

Case No. 08-20198-CIV-ALTONAGA/Simonton

as World Holdings contends, the 1953 Treaty was only negotiated to set up a validation procedure, and the Validation Treaty had already accomplished that, then the 1953 Treaty is superfluous. In other words, World Holdings's construction makes it so that one of the two treaties — either the Validation Treaty or 1953 Treaty — is superfluous.

Treaties should not be interpreted to be superfluous. *See Sullivan v. Kidd*, 254 U.S. 433, 439 (1921) ("[A]ll parts of a treaty are to receive a reasonable construction with a view to giving a fair operation to the whole.") (citing Moore, International Law Digest, vol. 5, p. 249.); *In re Comm'r's Subpoenas*, 325 F.3d at 1295; *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 458 (D.N.J. 1999) (interpreting the LDA and stating "[i]t is a cardinal principle of construction that courts shall interpret contracts, including treaties, so as to give meaning to each provision rather than rendering some provisions, or portions thereof, superfluous.") (citations omitted). The 1953 Treaty, in light of the Validation Treaty, only has any force, makes sense, and best accomplishes its purpose if it is applicable to all U.S. bondholders.

> d. *The SEC Rule supports an interpretation that all bonds must be validated.*

Furthermore, the SEC's actions — post treaties — support the interpretation that the 1953 Treaty required all U.S. bondholders have their bonds validated.[28] Following the proclamations of the various treaties, the SEC passed Rule X-15C2-3 in 1954 making it a "fraudulent, deceptive or manipulative act or practice" for any broker or dealer to effect any transaction of any German security "unless it has been duly validated." Trading in German Securities, 19 Fed. Reg. 313.

---

[28] The SEC's interpretation carries weight as the SEC was a major impetus for validation in the United States, seeking to protect U.S. markets from trading on invalid bonds.

47

Case No. 08-20198-CIV-ALTONAGA/Simonton

Rule X-15C2-3, making it illegal to trade in non-validated German securities,[29] is further proof that the 1953 Treaty meant exactly what it said: all bondholders must have their bonds validated in order for the bonds to be enforceable. And because the Rule was promulgated after the 1953 Treaty and LDA were proclaimed by the President, it demonstrates the LDA did not conflict with the 1953 Treaty by removing the validation requirement for non-assenters. It is strong evidence that validation was required for enforcement of all bonds, whether or not bondholders accepted the LDA.

The SEC Rule only applied to bonds that were not settled under the LDA. When holders of "old" bonds accepted the LDA they received either "new" bonds with extended maturity dates or immediate payment. *See* London Debt Agreement, Annex I. In either case, validation was not again required (on either the new bonds or on the money received). Although the new bonds would not be validated under the Validation Law, the SEC Rule did not apply to the new bonds and require their validation before they could legally be part of a transaction because the new bonds were not "required to be validated." Trading in German Securities, 19 Fed. Reg. 313. Because they were not "required to be validated," the Rule would not make trading in non-validated "new" bonds illegal. The Rule only applied to non-validated "old" bonds and only made sense where applied to non-validated bonds held by bondholders who did not accept the LDA.

       e.    *Requiring validation of LDA-accepted bonds only would disrupt the "comprehensive" scheme*.

It would make little sense to require only those accepting the LDA's settlement offer to

---

[29] The SEC Rule only applied to German securities that required validation; if the security was one that did not require validation to be enforceable, it was not covered by the Rule.

48

validate.  That would simply allow holders of invalid bonds to wait before seeking payment until

those who settled under the LDA were paid.  Or, holders of looted bonds could seek to enforce them

in the United States.  This is contrary to the comprehensive validation scheme.  The 1953 Treaty was

enacted to "make validation effective and to bar the assertion of claims by holders of bonds looted

by the Russians," and had "the purpose of preventing holders of non-validated bonds from enforcing

these bonds in judicial or other proceedings in the United States."  Enclosure 7(d), 234.  This was

to provide "assurance that claims prejudicial to the settlement [would] not be asserted on the basis

of bonds unlawfully acquired."  *Id.*

> f.  *The limited window to accept the LDA, with the continuing validation
> requirement, indicate that validation is required of all bonds.*

Finally, the LDA settlement offer was open for five years, although it could be extended for

reasonable cause.  *See* London Debt Agreement, Annex I, at 527.  Timely validation was available

for a limited period, but the Validation Law allowed for subsequent validation in certain situations

where the bondholder failed to timely validate.  *See* Validation Law, BGBl.II, Art. 52 at 317.  To

seek payment under Article 52 of the Validation Law on bonds not timely validated, the bonds must

have been able to be registered.  *See id.*  To receive payment under Article 52, it must be "finally

adjudicated that the conditions on which [the right to compensation] depends exist."  *Id.*  The

Chamber for the Settlement of Securities has the exclusive jurisdiction to make that determination.

*See id.*

If validation was only required for the LDA, then upon the termination of the LDA's open

offer of settlement, the validation requirement, too, should have expired.  By still requiring those

seeking payment to meet the validation requirements — by demonstrating the bonds *would* have

Case No. 08-20198-CIV-ALTONAGA/Simonton

been validated *if* timely registered — the subsequent validation requirement evinces that the 1953 Treaty applies to all bonds, not only those bonds whose holders accepted the LDA's terms.  If the 1953 Treaty's validation requirement only applied to the LDA, it would be expected that the 1953 Treaty's validation requirement should have terminated along with the open offer of settlement contained in the LDA.

*          *          *

In the end, World Holdings purchased the Bonds "with full knowledge of these treaty obligations and the resulting risk [it] was undertaking." *Teplin v. Fed. Republic of Germany*, No. 81-1874, 1982 U.S. App. LEXIS 12629, at *3 (D.C. Cir. Aug. 18, 1982).  It may still obtain payment on the Bonds, but it must first apply in Germany for validation.  At this time, World Holdings's Bonds are not enforceable in the U.S. courts.

### 4. *Mortimer Off Shore Services, Limited v. Federal Republic of Germany*

This conclusion is further supported by the recent decision in *Mortimer Off Shore Services, Limited v. Federal Republic of Germany*, 615 F.3d 97, where the Second Circuit Court of Appeals decided that a bondholder who did not assent to the LDA must validate its bonds in accordance with the 1953 Treaty and Validation Law.  The plaintiff, Mortimer Off Shore Services, Limited ("Mortimer"), possessed 351 German bearer bonds (German Provincial & Communal Bank Consolidated Agricultural Loan Secured Sinking Fund Gold Bonds Series A).  *See id.* at 99.[30] Mortimer did not comply with the validation procedures, arguing it did not need to comply with the

---

[30] Mortimer owned bonds issued from banks located both in the former East Germany and West Germany.  *See* 615 F.3d at 99.  World Holdings only owns bonds issued from West Germany.  All three sets of bonds — Dawes, Young, and the *Mortimer* agricultural bonds — are covered by the Validation Law.  *See* Validation Law BGBl.II at 323, 327.

validation procedures because the Validation Law was no longer in effect and because its "claims [were] enforceable notwithstanding its refusal to register and submit the West German Bonds to a Validation Board." *Id.* at 114. The Second Circuit found the Validation Law was still in force and applied to West German bonds. *Id.* at 114–15.

The court considered whether Mortimer, as an LDA "non-assenter," was required to comply with the Validation Law. *Id.* at 115. Mortimer was a "non-assenter" because it did not agree to settle under the LDA[31] and did not register or present its bonds "in accordance with" the Validation Law. *Id.* at 115 & n.17. Mortimer maintained it did not need to comply with the Validation Law because the law's "sole restriction" was that a claim could "not be asserted to the prejudice of the holders of validated foreign currency bonds." *Id.* at 115 (citing Validation Law, BGBl.II, at 317). According to the plaintiff, since Germany had already made final payments to creditors in 1994, it was not possible that "validated bondholders would be prejudiced by a non-assenter's claim." *Id.* at 115–16.

The court rejected Mortimer's arguments "[i]n light of the express validation requirements in the Validation Law, 1953 Treaty, and London Debt Accord . . . ." *Id.* at 116. The potential prejudice to validated bondholders was not the only reason for the validation requirement. *See id.* The Validation Law required "that a claimant establish two preconditions prior to asserting such a claim: (1) that the bonds at issue were 'validated upon timely registration'; and (2) that 'the failure

---

[31] The Second Circuit used the term "'non-assenter' because the London Debt Accord only deems bonds enforceable if the bondholder 'assent[s] to the . . . conditions in respect of such debts,' 4 U.S.T. at 453, Art. 15(1), which refers in the case of West German bonds to compliance with the Validation Law's procedures." *Mortimer Off Shore Servs.*, 615 F.3d at 115 n.17 (alterations in original). Article 15(1) of the LDA refers to "benefits" under the LDA — meaning the term non-assenter refers to one who did not assent to the LDA. London Debt Agreement, Art. 15(1), at 453.

to register [the bonds] was not due to . . . gross negligence.'" *Id.* (quoting BGBl.II, Art. 52(1) at 317) (alterations in original).  Under the Validation Law, "the right to compensation for non-validated bonds created by Article 52 'can be asserted *only after it has been finally adjudicated* that the conditions' set forth in Article 52(1) have been met." *Id.* (quoting BGBl.II, Art. 52(2), at 317) (emphasis in original).

The Second Circuit concluded that LDA non-assenters such as Mortimer could not enforce bonds without complying with the Validation Law: "In sum, a non-assenter can only enforce bonds covered by the Validation Law after complying with the validation procedures and explaining why any delay in doing so is excusable." *Id.* at 117.  Because Mortimer had not complied with the validation procedures, Mortimer's claims were properly dismissed.  *See id.*

World Holdings attempts to distinguish *Mortimer*. (*See* Mot. Opp'n 13).  It points out that the bonds there were issued by private banks, and the parties negotiating the debt were different than those who negotiated the settlement offers to Dawes and Young bondholders. (*See id.*).  Plaintiff maintains that Dawes and Young loans had priority status over other German debts. (*See id.*). World Holdings further urges that as a result of the different procedural postures — summary judgment here and a motion to dismiss in *Mortimer* — the Second Circuit "did not have access to Germany's own documents describing its own interpretation of the LDA and Validation Treaty . . . ." (*Id.* at 14).[32]  In the end, the Plaintiff avers *Mortimer* is based on "substantially different" facts,

---

[32] World Holdings also contends that due to the procedural posture of the case, the plaintiff did not raise its LDA arguments until later, after discovery was denied, and as a result the plaintiff did not have access to "important 'history, negotiations, and post-ratification conduct.'" (Mot. Opp'n 16).  In its briefing, Mortimer cited a large number of "secondary sources" similar in nature to those that World Holdings presents here.  Simply because Mortimer chose to cite different "history, negotiations, and post-ratification conduct" does not mean it did not have access to World Holdings's cited materials.  *See* Brief for Appellants-

Case No. 08-20198-CIV-ALTONAGA/Simonton

and is "mere dicta from another circuit that is not binding here."  (*Id.*) (citations omitted).

In addition to arguing *Mortimer* should not apply, World Holdings asserts the court decided the case (*see id.* at 15) by "incorrectly defin[ing] a non-assenting bondholder under the LDA."  (*Id.*). Unlike the Second Circuit's definition, World Holdings says the LDA does not control enforceability, but rather was an open settlement offer.  (*See id.*) (citing London Debt Agreement, Art. 15).

Contrary to World Holdings's assertions, the plaintiff in *Mortimer* did in fact raise many of the same arguments presented here.  Mortimer argued the 1953 Treaty and Validation Law did not apply because it never "assented to an offer for settlement made under the London Debt Accord . . . ." Mortimer Brief, at 34.  It asserted that the LDA was voluntary and not required, and the benefit was an expedited payment.  *See id.* at 35.  Mortimer argued that the 1953 Treaty did not bar its claims against West German issuers because the 1953 Treaty "enforced the priority established by the London Debt Accord, which gave first priority to claimants who accept settlement offers and submit to the procedures of the Validation Laws." Response and Reply of Plaintiff-Appellant-Cross-Appellee at 25–26, *Mortimer Off Shore Servs*, 615 F.3d 97 (Nos. 08-1783-cv, 08-2358-cv) (hereinafter "Mortimer Response").  Mortimer said the 1953 Treaty and LDA were intertwined and simply set a priority for payments on bonds.  *See id.* at 27.  Those who did not accept the LDA had to wait until all assenters' claims were satisfied, which Mortimer asserted finally occurred in 1994. *See id.* at 25–26.  Since Mortimer was not seeking payments under the LDA, its claims could not prejudice those that accepted the LDA, and were thus not barred by the 1953 Treaty.  *See id.* at 27.

Cross-Appellants at Table of Authorities iv–viii, *Mortimer Off Shore Servs., Ltd. v. Fed. Rep. of Ger.*, 615 F.3d 97 (2d Cir. 2010) (Nos. 08-1783-cv, 08-2358-cv) (hereinafter "Mortimer Brief").

53

Case No. 08-20198-CIV-ALTONAGA/Simonton

And because there was "no possibility of prejudice to holders of validated bonds . . . non-assenting bondholders were no longer precluded by the Validation Law from enforcing their claims." Mortimer Brief, at 37 (footnote call number omitted).

The plaintiff argued that the Validation Law did not require validation because by its terms, "foreign currency bonds that are not validated 'are subject to Articles 50, 52 to 54.'" *Id.* at 36 (quoting Validation Law, BGBl.II, at Art. II). It argued that holders of non-validated bonds still had the right to claim compensation. *See id.* (quoting Validation Law, BGBl.II, at Art. 52).

Mortimer also argued the Validation Law protected non-assenters to the LDA "by ensuring that they 'shall' have the right to claim compensation from the issuer and any third party liable directly as a debtor for the bonded obligations of the issue concerned, if the bond *would have been validated* upon timely registration . . . ." Mortimer Response, at 26 (emphasis in original) (quoting Validation Law, BGBl.II, at Art. 52(1)). It contended that this language meant validation was not required. *Id.* Finally, Mortimer argued the Validation Law was no longer in effect, and thus the 1953 Treaty did not bar its claims. *See* Mortimer Brief, at 38.

In finding Mortimer could not enforce its West German bonds in the United States, the court explicitly and implicitly rejected all of Mortimer's arguments. The undersigned agrees with the well-reasoned decision of the Second Circuit.[33] The 1953 Treaty and the validation requirement apply to all bonds, and LDA non-assenters may only enforce their bonds after complying with the Validation Law. *See Mortimer*, 615 F.3d at 117; *see also Teplin*, 1982 U.S. App. LEXIS 12629, at

---

[33] While the undersigned may have a greater volume of materials to consider than did the court in *Mortimer*, without considering the additional materials the Court is persuaded that the 1953 Treaty applies to all U.S. bondholders.

Case No. 08-20198-CIV-ALTONAGA/Simonton

*2–3 (affirming summary judgment in Germany's favor because Teplin did not validate his bonds, "making them unenforceable in U.S. courts.").

## c.  Due Process

World Holdings makes a number of arguments challenging the German validation requirement under notions of due process. (*See* Mot Opp'n 11–12). Plaintiff contends notice of the validation requirement was inadequate, relying on *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). (*See id.* at 12). According to World Holdings, the "notices were sparsely published and hidden in the back pages of newspapers and financial publications." (*Id.*). World Holdings also insists the Examining Agency's proceedings today do not meet due process. (*See id.*). It asserts that Germany does not disclose the evidence it keeps on the Bonds. (*See* SMFO ¶ 41 (citing Jaeger Dep. 47:12–17)). World Holdings complains that Germany makes a determination based on a "list," but has no evidence supporting that list. (*Id.* ¶¶ 42–44 (citing Jaeger Dep. 46:20–24, 60:12–16, 109:17–19)). World Holdings further objects that the Examining Agency relies on hearsay, and "there is no meaningful opportunity for an American bondholder to be heard or to present witnesses or documentary evidence." (Mot. Opp'n 12 (citing Jaeger Dep. 46:25–47:6; SMFO ¶¶ 44–45 (citing Jaeger Dep. 46:25, 47:6, 12–17, 60:12–16, 109:17–19)). Plaintiff asserts the Examining Agency is not "neutral and detached," but rather is "predisposed to invalidate bonds based on its discredited stolen bonds theory and the German Court routinely adopts the Agency's conclusion." (Mot. Opp'n 12 (citing Jaeger Dep. 101:2, 106:8, 109:17–19, 110:2)).

For notice to comport with due process, it must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an

55

opportunity to present their objections." *Mullane*, 339 U.S. at 314.

> The general rule that emerges from the *Mullane* case is that notice by publication is not enough with respect to a person whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question. "Where the names and post office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency."

*Schroeder v. City of New York*, 371 U.S. 208, 212–13 (1962) (quoting *Mullane*, 339 U.S. at 318).

The Bonds were bearer bonds sold in the U.S. markets. (*See* Am. Compl. ¶¶ 17, 26). World Holdings has not alleged that the bond owners were known or easily ascertainable by Germany. (*See generally* Am. Compl.; Mot. Opp'n). Indeed, the Validation Treaty indicates Germany had no knowledge of who actually owned the bonds. *See* Validation Treaty, 4 U.S.T. 797, at pmbl.. Here, amongst other announcements, the notices were posted in *The New York Times*[34] and *The Washington Post*. This was contemplated by the Validation Treaty, under which Germany would

> cause notice of such required action to be published three times in at least one newspaper of general circulation in each Federal Reserve District, territory and possession of the United States, in at least three periodicals of general circulation throughout the United States, and in at least six financial journals in the United States, and cause appropriate announcements to be sent to such other institutions and individuals as may be designated by the United States Government.

Validation Treaty, 4 U.S.T. 797, § 5.[35]

---

[34] In 1949, *The New York Times* was the tenth most read newspaper in America, with circulation of 537,216 papers. *See* Russell Kahn, *Top 10 Dailies in Circulation*, Editor & Publisher Magazine 32 (Nov. 13, 1999).

[35] World Holdings has not asserted that the United States and Germany did not comply with Section 5 of the Validation Treaty. Rather, World Holdings merely submitted certain ads from *The New York Times* and *The Washington Post* without otherwise showing the notices were the sole actions taken by the two countries to alert bondholders. (*See* Summ. J. Hr'g 31:9) (stating World Holdings had "found some of these

Case No. 08-20198-CIV-ALTONAGA/Simonton

Even if World Holdings is correct that notices in two widely read national newspapers in the United States did not comport with due process, any error is harmless. The Validation Law allows for subsequent validation so long as there was no gross negligence on the bondholder's behalf. If bondholders were unaware of the validation requirement because of inadequate notice, they were not grossly negligent for failing to validate bonds. If those bonds would have been validated upon timely registration (i.e., not stolen bonds), gross negligence would not be a bar, and the bondholder would still receive payment. Consequently, even if due process was violated because of insufficient notice, given the availability of subsequent validation, it would not deprive a bondholder of any *rights*.

The validation scheme set up by the 1953 Treaty, Validation Law, and "related measures" also comports with due process. *See Abrey*, 153 F. Supp. at 342. "'The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Reams v. Irvin*, 561 F.3d 1258, 1263 (11th Cir. 2009) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). The validation process includes an agency determination[36] by the German Examining Agency, in certain situations an application for reconsideration of denial, a *de novo* review by the German Court (the Chamber for the Settlement of Securities), and an appeal (sofortige Beschwerde) to the Oberlandesgericht competent. *See* Validation Law, BGBl.II, at Arts. 21–31. This course of action satisfies due process. *See Reams*, 561 F.3d at 1266 (finding due process was met where there was an administrative review of a "deprivation," and judicial review of the administrative decision)

---

ads." ).

[36] The difference between validation of timely registered bonds and subsequently registered bonds (post-1958) is that with the latter the Examining Agency's determination is not a binding decision. (*See* Mot. 8 n.10). Rather, the Examining Agency only makes a recommendation to the German Court — the Chamber for the Settlement of Securities. (*See id.*).

(citation omitted).  "[P]rovisions of the [1953] Treaty, the Validation Law and the related measures clearly satisfy the requirements of due process."  *Abrey*, 153 F. Supp. at 342.[37]

Finally, the Eleventh Circuit has previously held that "Germany's legal system clearly follows procedures that ensure that litigants will receive treatment that satisfies American notions of due process."  *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1520 (11th Cir. 1994). Other federal courts have come to the same determination — that the German courts comport with the American concept of due process.  *See Gita Sports Ltd. v. SG Sensortechnik GmbH & Co. KG*, 560 F. Supp. 2d 432, 439 (W.D.N.C. 2008) (finding that the parties would have their "day in court" in Germany because "[d]espite the procedural differences of the German courts — differences that are inevitable in any legal system that is not our own — the Court is in accord with the other courts who have considered this issue in concluding that Germany has a fair and civilized legal system."); *Martin v. Volger*, No. 93 C 3870, 1993 WL 462853, at *1-2 (N.D. Ill. Nov. 9, 1993).  The Validation Law provides for an agency determination, a court decision, and an appeal.  *See* Validation Law, Arts. 51, 52.  This framework conforms with due process.

#### d.  Equitable Modification

In the event the Court finds the 1953 Treaty and validation requirement apply to all bondholders, and not only those who accepted the LDA's offer, World Holdings seeks to be

---

[37] Notably, the decision in *Abrey* was entered three years after notice of the validation requirements was placed in the *New York Times* and *The Washington Post*.  Further, although the court in *Abrey* was dealing with a U.S. Validation Board (no longer in existence) and here, World Holdings would first submit its Bonds to the German Examining Agency, this difference does not render *Abrey* inapposite.  Nor does World Holdings attempt to argue that.  The 1953 Treaty provided that the two units were, for validation purposes, equivalent; validation was required "either by the Board for the Validation of German Bonds in the United States established by the Agreement on Validation procedures, or by the authorities competent for that purpose in the Federal Republic."  1953 Treaty, 4 U.S.T. 885, at Art. III.

equitably excused from the validation requirement.  (*See* Mot. Opp'n 17–19).  World Holdings points to cases where federal courts have equitably excused statutory requirements.  (*See id.* at 17).  Notably, however, it has conceded that it had found no cases equitably excusing a party from a treaty's requirements.  (*See* Summ. J. Hr'g 40:11–41:6).  World Holdings maintains that because statutes and treaties are both the *law of the land*, equitable modification should apply equally to treaties, and it should be equitably excused from the validation requirement.  (*See id.* at 40:9–41:6).

World Holdings seeks to be equitably excused from the validation requirement because the purpose of this requirement was to prove bonds had not already been paid by Germany.  (*See* SMFO ¶ 47 (citing 1953 Treaty pmbl.); Summ. J. Hr'g 39:22–42:1).  It further maintains that Germany has admitted the Bonds have not been paid.  (*See* SMFO ¶ 48 (citing June 6, 2009 Hr'g 7:1–2, 16:3–5, 22:12–17 [ECF No. 106])).  Indeed, Germany withdrew its affirmative defenses of payment, and accord and satisfaction.  (*See* Mot. Opp'n 18).  World Holdings also states that the Soviet-seized bonds were returned to Germany and not re-circulated in the market.  (*See* SMFO ¶¶ 49, 50 (citing Jaeger Dep. 19:18–21:8; Kopper Report, at 2)).  In sum, because the Soviet "myth" has been debunked, and the Bonds have not been paid, World Holdings maintains the Court should equitably excuse it from the validation requirement.  (*See* Mot. Opp'n 17–19).

In certain situations, statutory requirements may be equitably excused through the doctrine of equitable modification.  *See Forehand v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562, 1569–70 (11th Cir. 1996).  "Where a provision proves to be merely a condition precedent to bringing suit instead of a source of judicial power, the courts can, given the appropriate circumstances, equitably modify their application of the statutory terms." *Harris v. Amoco Prod. Co.*, 768 F.2d 669,

Case No. 08-20198-CIV-ALTONAGA/Simonton

679 (5th Cir. 1985). Whether or not the circumstances are "'appropriate' in turn depends on the purpose the provision is intended to serve." *Id.*

While both treaties and statutes are the "law of the land," one significant difference is that a treaty binds the United States with another country or countries. The 1953 Treaty binds the United States and Germany. If the Court were to equitably excuse World Holdings from the validation requirement of the 1953 Treaty, the Court would in essence be modifying that Treaty even though it remains in force between the two countries. Not only would the Court be excusing Plaintiff from complying with U.S. law, it would be excusing Plaintiff from compliance with German law (the Validation Law) as well. Principles of comity weigh against the Court taking that step. The Court will not attempt to exercise the extraterritorial powers of the federal judiciary to nullify Germany's laws.

Finally, Germany has represented that if World Holdings goes to Germany and validates the Bonds, World Holdings will be paid. (*See* Summ. J. Hr'g 54:7–55:5). And if the Bonds are, for some reason, not validated, an appeal may be presented in the German courts. (*See* Summ. J. Hr'g 55:7–10).

Based on the foregoing, the Court will not equitably modify the 1953 Treaty and excuse World Holdings from complying with the validation requirement.

### IV. CONCLUSION

For the above-cited reasons, World Holdings may not proceed and seek payment in U.S. courts on the 2,029 Bonds that have not been validated and are the subject of this Motion. Finding no disputed issues of material fact, it is **ORDERED AND ADJUDGED** that Defendant, the Federal

Case No. 08-20198-CIV-ALTONAGA/Simonton

Republic of Germany's Motion for Partial Summary Judgment **[ECF No. 176]** is **GRANTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 6th day of May, 2011.

_____

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

61